UNITED STATES DISTRICT COURT
for the
EASTERN DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JUDITH THIBEAU, | ) | |
| And GEORGE THIBEAU, | ) | |
| Plaintiffs | ) | |
| | ) | |
| VS. | ) | **CIVIL ACTION** |
| | ) | **NO. 04-10643 LTS** |
| UNITED STATES OF AMERICA | ) | |
| and EAST BOSTON NEIGHBORHOOD | ) | |
| HEALTH CENTER CORPORATION, | ) | |
| Defendants | ) | |

**DEFENDANT EAST BOSTON NEIGHBORHOOD HEALTH CENTER
CORPORATION'S EXPERT DISCLOSURES PURSUANT TO
FED.R.CIV. 4.26(a)(2)(A)-(E)**

NOW COMES the defendant East Boston Neighborhood Health Clinic ("EBNHC") and

hereby submits its expert disclosure pursuant to Rule 26(a)(2)(A)-(E).

    1.      Steven R. Frederickson, P.E.
            272 Salem Street
            Lynnfield, MA 01940

Mr. Fredickson is Registered Professional Engineer with an extensive background in building inspections, analysis, design, specifications, and code consulting and reviews on a variety of both small and multi-million dollar projects in the public and private sectors. He has been an engineer for 27 years and is a licensed Registered Professional Engineer in four states including Massachusetts. He is likewise licensed by Massachusetts as a Certified Inspector of Buildings. A copy of his CV is attached to this disclosure.

Mr. Frederickson is expected to testify as to the construction, maintenance and design of the building and stairwell located at 79 Paris Street, East Boston, Massachusetts as well as in regard to the proffered opinion of plaintiffs' expert, Herbert Eisenberg, and the claims being made in this action. Mr. Frederickson is expected to provide expert testimony based on his education, training and experience as well as his review of the depositions (Mrs. Thibeau, Dennis Buchieri), an inspection of the premises and stairwell located at 79 Paris Street, the discovery in this action as well as applicable building codes and requirements.

Mr. Frederickson is expected to testify that the building is an 80 year-old, three-story, brick masonry structure that is currently being used to provide healthcare and related services. The building is classified as an 1-2 (institutional use) structure. There is a lobby at the front center of the building. The main stairwell is located to the right of the floor lobby (viewed as you face the property from the street). The stairway leads from the first floor up to the second floor.

971263v1

The stairway is approximately 4' -4" in width. Stair risers are approximately 7" high and treads are 11" deep. Stair treads appear to be constructed of terrazo. Treads and risers are solid. There are no signs of cracks or other defects in any of the treads or risers. There is a wall on the right side of the stairway (viewed as you descend the stairway from the top). There is a wood handrail mounted on the wall. The left side of the stairway is open. The open left side is protected by a guardrail with vertical iron balusters. The top wood rail of the guardrail serves as a handrail. The top of the rail is 32.5" above the nosing (the leading edge) of the stairs.

The handrails are approximately 2½ deep and 2½ wide, with routed sides to improve grasp ability . All handrails are solid and well-maintained. Handrails are continuous and there is a handrail present that is adjacent to all treads on both sides of the stairway. At the bottom of the stairwell on the first floor there is a landing which faces a wall in front of the stairwell. The bottom of the stairwell is approximately 4 to 5 feet from the wall.

There is likewise an elevator in the building. It is located a few feet from the stairwell and is easily visible and accessible both at the first and second floor levels.

There is an overhead light on the ceiling at the top and bottom of the first floor stairway, and a window at the landing at the top of the stairway. The light meter registered a lighting level of 7.2 foot-candles at the bottom of the first floor stairway.

Mr. Frederickson will opine that the building is an existing building and pursuant to applicable regulations the stairwell is presumed to comply with any code that was in effect at the time of construction. He will opine that there is no requirement to upgrade the stairway to meet current code requirements. Mr. Frederickson will testify that under current code provisions if an existing means of egress is deemed to be unsafe, the building inspector has the authority to require upgrades and that no building inspection of 79 Pairs street has deemed the stairway or the handrails on the stairway unsafe or to require extended handrails. He will testify that based on the records the building has been regularly inspected and that no inspection has resulted in any order or request to extend the handrail and the stairwell and structure is and has been deemed to be safe at the time of the inspections.

Mr. Frederickson is expected to testify that the stairwell and handrails are well-maintained, designed, and constructed, are safe for their intended use, and that the lack of an extended handrail did not pose a dangerous or unsafe condition. He will testify that the stairwell is well-lighted, providing a lighting level of 7.2 foot candles exceeding the requirements under the current code requirements at the time of inspection. He is expected to testify to the design and construction of the handrails and stairwell and that even under current code requirements the stairs and handrail substantially comply including as to the size of the treads and risers, the height of the handrail, and handrail graspability.

Mr. Frederickson is expected to testify in rebuttal to the allegation that the lack of a handrail extension of the inner or open handrail at the bottom of the stairs created an unsafe condition or otherwise caused Mrs. Thibeau's fall and injury. Mr. Frederickson will testify that the lack of a handrail extension did not create an unsafe condition and that based on the

971263v1

testimony of Mrs. Thibeau as to how she fell, the lack of a handrail extension played no role in her fall or injury.  Mr. Frederickson will testify as to the current code requirements regarding handrail extensions; that the handrail in the open or inner side of the stairwell ends at the bottom step; and that there is a rail available to grasp on both sides of the lowest step.  He will testify that even under the current code provisions, and specifically the Massachusetts Architectural Access Board Regulations, a handrail extension at either the top or bottom of a stairwell is not required "if it would cause a safety hazard or if space does not permit."  He will testify as to the ADA's provisions and that a handrail extension was not "readily achievable" given the location of the stairs and the proximity to the facing wall.  Mr. Frederickson will opine to a reasonable degree of engineering certainty that the extension of the handrail at the bottom of the open or inner side of the stairs would project into the landing at the bottom of the stairway and would thus likely cause a safety hazard.  Given the location of the stairwell and physical layout of the bottom floor including landing and proximity of the stairwell to the facing wall, installation of an extended handrail on the open or inner side is not "readily achievable" and would impede access and otherwise be more hazardous and unsafe then the lack of an extension.

Mr. Frederickson will testify further that the lack of a handrail did not play any role in Mrs. Thibeau's fall or injury in that she testified, *inter alia*, that she could see where she was walking, could see the handrail, could see the steps, and that she took her hand off the handrail (on the open and inner side of the stairwell) a number of inches before the handrail ended.

Mr. Frederickson is expected to educate the jury and testify consistently with the applicable building regulations and code.  He will testify to a reasonable degree of engineering and building inspection certainty.  He will testify as to the physical lay-out of the stairwell and building and the location and accessibility of the elevator.  He will opine that the elevator is located only a few feet from the stairwell and is open and obvious and is easily accessible and visible and seen from both the bottom and top of the stairwell.  He will further testify that the lack of any sign indicating the location or presence of an elevator did not cause Mrs. Thibeau's fall or injury.

It is further expected that Mr. Frederickson may be called to testify as to any and all subjects, factual basis and opinions raised in this litigation or at trial including the asserted opinion(s) of plaintiff's expert and expressly reserves the right to supplement this disclosure.

Pursuant to Rule 26, Mr. Frederickson's testimony history is attached to this response.  Further, his rate for preparing his report was $125 per hour and at a total cost of approximately $1,000 to $1,500.  His rate for deposition or trial preparation or testimony is $185.50 per hour.

2.    Michael Contre, RA
      Liberty Architectural Associates, Inc
      Braintree, MA 02184

Mr. Contre is a registered architect with over twenty years of experience. A copy of his report and CV is attached. Mr. Contre has not testified before nor authored any publications. Mr. Contre's rate for preparing his report was $125 per hour. The cost of his report was approximately $2500. His charge for testifying at trial or at deposition is $190 per hour.

The Defendant
East Boston Neighborhood Health Center
By its attorneys,

I hereby certify that a true copy of the
above document was served upon the attorney
of record for each party by mail on
10/3/05

Tory A. Weigand

Tory A. Weigand/BBO #548553
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA  02210
Tel: 617-439-7500
Direct Fax: 617-342-4947

Date:    October 27, 2005
RE:    Thibeau v. East Boston Neighborhood Center
        Review of Interior Stairway Code Compliance and Safety Issues

In response to your request, I conducted an inspection of the building and stairwell at 79 Paris Street, East Boston, Massachusetts for the purpose of determining if there are any conditions that exist that could have caused or contributed to a trip-and-fall that is alleged to have occurred on September 26, 2002. At the time of my inspection, I took various photographs and measurements. In addition, and in preparation for my report, I reviewed a number of documents including:

- June 24, 2005 Deposition of Dennis Buchieri
- June 28, 2005 Deposition of Judith Thibeau
- January 15,2003 Report by Herbert W. Eisenberg, AlA

I am a registered Professional Engineer. I am licensed in four states including Massachusetts. I have been an engineer for 27 years and have an extensive background in building inspections, analysis, design, specifications, and code consulting and reviews of a variety of both small and multi-million dollar projects in the public and private sectors. I am also licensed by Massachusetts as a Certified Inspector of Buildings. A copy of my CV is attached.

**Description of Structure**: The building is an 80 year-old, three-story, brick masonry structure that is currently being used as a health clinic. The building is classified as an I-2 (institutional use) structure. There is a lobby at the front center of the building. The main exit stairway is located to the right of the floor lobby (viewed as you face the property from the street). The stairway leads from the first floor up to the second floor.

The stairway is approximately 4' -4" in width. Stair risers are approximately 7" high and treads are approximately 11" deep. Stair treads appear to be constructed of terrazo. Treads and risers are solid. There are no signs of cracks or other defects in any of the treads or risers. The stairs were well-maintained and well-constructed.

There is a wall on the right side of the stairway (viewed as you descend the stairway from the top). There is a wood handrail mounted on the wall. The left or inner side of the stairway is open. The open or inner left side is protected by a guardrail with vertical iron balusters. The top wood rail of the guardrail serves as a handrail. The top of the rail is 32.5" above the nosing (the leading edge) of the stairs.

The handrails are approximately 2 ½" deep and 2 ½" wide, with routed sides to improve graspability. The handrails are solid, well-designed and well-maintained. The handrails are continuous and there is a handrail present that is adjacent to all treads on both sides of the stairway.

At the bottom of the stairway on the first floor there is a landing which faces a wall in front of the stairway. The bottom of the stairway is approximately 4 to 5 feet from the wall.

There is an elevator in the building which is located a few feet from the stairway and is easily visible and accessible at both at the first and second floor level.

There is an overhead light on the ceiling at the top and bottom of the first floor stairway, and a window at the landing at the top of the stairway. A light meter registered a lighting level of 7.2 foot-candles at the bottom of the first floor standing.

**Code Provisions**: The following provisions of the Commonwealth of Massachusetts State Building Code 780 CMR govern existing buildings:

> **102.5 Applicability to Existing Buildings**
>
> **102.5.2** Unless specifically provided otherwise in 780 CMR, any existing building or structure shall meet and shall be presumed to meet the provisions of the applicable laws, codes, rules or regulations, bylaws or ordinances in effect at the time such building or structure was constructed or altered and shall be allowed to continue to be occupied pursuant to its use and occupancy, provided that the building or structure shall be maintained in accordance with 780 CMR 103.0.
>
> **3400.1 General**: The provisions of 780 CMR 34 are intended to maintain or increase public safety, health, and general welfare in existing buildings by permitting repair, alteration, addition, and/or change of use without requiring full compliance with the code for new construction except where otherwise specified in 780 CMR 34.

Therefore, the existing stairway can be presumed to have complied with the code that was in effect at the time of construction, and there is no requirement to upgrade any stairway to the current code requirements. However, if an existing means of egress is deemed to be unsafe, the building official has the authority to require upgrades, provided for as follows:

> **3400.5 Hazardous Means of Egress:**
>
> **3400.5.1 Exit Order/Hazardous Means of Egress:** In any existing building or structure not provided with exit facilities as herein prescribed for new buildings and in which the exits are deemed hazardous or dangerous to life and limb, the building official shall declare such building dangerous and unsafe in accordance with the provisions of 780 CMR 121.0.

I am not aware that any building official has ever deemed the stairway or handrails to be unsafe or otherwise require that the handrails be extended. In fact, there is a Commonwealth of Massachusetts Certificate of Inspection, posted on the wall in the lobby at the base of the

stairway. The certificate expires on April 15, 2005. There is no date of issuance indicated on the certificate. The maximum certification period for an I-2 use is two years, per 780 CMR Table 106. Issuance of the certificate indicates that the structure was deemed to be safe at the time of inspection.

With respect to maintenance of existing buildings, 780 CMR 101.2 states:

> **103.1 General:** All buildings and structures and all parts thereof, both existing and new, and all systems and equipment therein which are regulated by 780 CMR shall be maintained in a safe, operable and sanitary condition. All service equipment, means of egress, devices and safeguards which are required by 780 CMR in a building or structure, or which were required by a previous statute in a building or structure, when erected, altered or repaired, shall be maintained in good working order.

In my opinion, the stairway and handrails are well maintained.

Although, as noted above, the stairway is not required to comply with the code for new construction, both the width of the treads and the height of the risers of the stairwell comply with the code for new construction. Further, even though the stairway is not required to comply with the code for new construction, the handrails substantially comply with the code for new construction including the height of the handrail and handrail graspability. In my opinion, the handrails have "equivalent graspability" and comply with the current code requirements. Attached is a series of handrail profiles that are generally considered to provide equivalent graspability.

With respect to lighting, it is my understanding that lighting is not being alleged to have been an issue. 780 CMR 1024.1 states:

> **1024.1 Artificial lighting:** All means of egress in other than occupancies in Use Group R-3 shall be equipped with artificial lighting facilities to provide the intensity of illumination herein prescribed continuously during the time that conditions of occupancy of the building require that the exits be available.
>
> Lighting shall also be provided to illuminate the exit discharge. Means of egress lighting in occupancies in Use Group R-2, other than lighting within a dwelling unit, shall be wired on a circuit independent of circuits within any dwelling unit. The disconnecting means and overcurrent protection device shall not be located within a dwelling unit or such that access to such devices must be obtained by going through a dwelling unit.
>
> **1024.2 Intensity of illumination:** The intensity of floor lighting shall not be less than one foot-candle (11 lux) except as provided for in 780 CMR 1024.3.

The lighting level at the time of my inspection was 7.2 foot-candles, which is well in excess of the current code requirements.

Mr. Eisenberg opined in his January 15, 2005 report that the lack of a handrail extension at the bottom of the stairs played a role in the fall. The handrail/guardrail on the open or inner side of the stairway terminates at the end of first step or bottom step. There is a rail available to grasp on both sides of the lowest step. However, the rail does not extend beyond the lowest step. 780 CMR 1022.2.4 address the need for an extension for new stairways as follows:

> **1022.2.4 Handrail ends:** At locations where handrails are not continuous between stairway flights, including the top and bottom of a stairway, the handrails shall extend horizontally at least 12 inches (305 mm) beyond the top riser and continue to slope for the depth of one tread beyond the bottom riser. The handrail ends shall be returned to a wall or post.

The Commonwealth of Massachusetts Architectural Access Board Regulations (AAB) 521 CMR also addresses handrail extensions, as follows:

> **27.4.3 Extensions:** Where handrails terminate at the top and bottom of a stair run, they shall have extensions that comply with the following:
>
> a.  At the top, extend at least 12 inches (12" = 305 mm) beyond the top riser and parallel with the floor or ground surface.
>
> b.  At the bottom, extend at least 12 inches (12" = 305 mm) plus the width of one tread beyond the bottom riser. The handrail shall continue to slope for a distance of the width of one tread from the bottom riser; the remainder of the extension shall be horizontal.
>
> c.  Handrail extensions need not extend if it would cause a safety hazard or if space does not permit.

In my opinion, the extension of a handrail at the bottom of the open or inner side of the stairs would project into the landing at the bottom of the stairway and would likely cause a safety hazard and thus even under the current code a handrail extension on the inner or left side would not be required. Note that the Americans With Disabilities Act Architectural Guidelines (ADAAG) do not have an exemption for handrail extensions. However, ADA requires compliance only to the maximum extent feasible. Given the location of the stairwell and physical lay-out of the bottom floor including the proximity of the stairwell to the facing wall, an extended handrail on the open or inner side would impede access and otherwise be more hazardous and unsafe than the lack of an extension. Therefore, in my opinion, it is not feasible to add a handrail extension at the bottom of the stairs.

**Conclusions:** In my opinion, the stairs and handrail are well constructed, designed and maintained and are safe for their intended use. The lack of an extended handrail did not pose a

dangerous or unsafe condition. The stairs and handrails are presumed to comply with the code in effect at the time of construction and are not required to meet the current code requirements for new construction. Further, under current code provisions, if an existing means of egress is deemed to be unsafe, the building inspector has the authority to require upgrades. I am not aware the any municipal building inspection of 79 Paris Street has deemed the stairway handrails on the stairway unsafe or to require extended handrails.

It is my opinion to a reasonable degree of engineering certainty that the lack of an extension of the inner or open handrail at the bottom of the stairs did not create an unsafe condition or otherwise play any role in Mrs. Thibeau's fall. Again, there is no requirement to upgrade an existing handrail to current code requirements. Also, the Architectural Access Board Regulations do not require a handrail extension where the extension would provide a safety hazard (where it could be walked into by passersby). Under the regulations, a handrail at either the top or bottom of a stairwell is not required "if it would cause a safety hazard or if space does not permit." In my opinion, an extension at the bottom of the stairs would be more hazardous than the lack of an extension given the proximity to the facing wall, the likelihood of impeding access, and the location of the stairs. Accordingly, even under the existing code, a handrail extension would not be required. Further, based on the deposition testimony of Mrs. Thibeau that she could see where she was walking, could see the handrail, could see the steps and, most importantly that she took her hand off the open or inner handrail a number of inches before the handrail ended and before she fell, it is my opinion that the lack of a handrail extension did not cause or play any role in her fall.

Finally, the elevator is located only a few feet from the stairwell and is open and obvious and is easily accessible and visible and seen from both the bottom and top of the stairwell.

Sincerely,

Steven R. Frederickson, P.E.

**RESUME OF:**     Steven R. Frederickson     Phone: (781) 595-6861
                   272 Salem Street           Fax:    (781) 595-8948
                   Lynnfield, MA 01940        Email: sfred11@hotmail.com

**BACKGROUND
SUMMARY:**         A Registered Professional Engineer with an extensive background in
                   building inspections, analysis, design, specifications, code consulting,
                   drawing preparation and reviews on a wide variety of both small and
                   multi-million dollar projects in both the public and private sectors.
                   Extensive experience working for municipalities. Director/Building
                   Commissioner overseeing all functions of several departments, including
                   Building Inspection, Health and Conservation; Member of BOCA and
                   ASCE Ad Hoc Committees on existing structures; Author of articles on
                   residential inspection and engineering for national publications;
                   experience in inspecting municipal engineering projects; land surveying
                   experience.

**TOWN OF
LEXINGTON:
(1991 to 2004)**    **As Director of Inspectional Services**

                   In charge of 15-person Department of Inspectional Services, which
                   combines the functions of the Building Department, Health Department,
                   Conservation Commission, Historic Districts Commission and Board of
                   Appeals. Responsible for overseeing day-to-day operation of the
                   department. Responsible for reviewing all building permit applications
                   for code compliance.

**TOWN OF
LEXINGTON:
(1985 to 2004)**    **As Building Commissioner**

                   In charge of five-person department of inspectors, including building,
                   wiring, plumbing/gas, mechanical, and zoning inspectors. Responsible
                   for enforcing State Building Code, reviewing construction plans, issuing
                   building permits, conducting inspections, and interpreting and enforcing
                   local zoning by-laws, State Architectural Access Board Regulations,
                   Subdivision Control Law and all related rules and regulations.
                   Responsible for overseeing inspections and/or conducting inspections of
                   all construction activity in the Town of Lexington for compliance with
                   approved plans and with all applicable construction codes.

**SELF-EMPLOYED:**  **As Consulting Engineer**
**(1983 to 2004)**

                   Experience in residential and light commercial civil and structural
                   engineering, construction inspection, code consulting and land surveying.
                   Experience in concrete, timber, steel, and masonry design and inspection.

**Resume of S.R. Frederickson/Page 2 of 3**

Author of several articles on residential and light commercial inspection and engineering.

**CITY OF CAMBRIDGE:**
**(1983 - 1984)**

**As Construction Engineer**

Responsible for design, specifications, review of bids, scheduling, inspection, and contractor/city liaison for municipal projects, with particular emphasis on street and sidewalk construction and construction of underground utilities within the public right-of-way. Responsible for surveying in connection with city boundaries, and field inspection of municipal construction projects; Responsible for approving methods of construction and verifying compliance with bid documents/specifications, final approval of completed project and approval of payments to contractors.

**STONE & WEBSTER ENGINEERING CORP:**
**(1978-1983)**

**As Structural Engineer**

Structural Engineer responsible for overall design and analysis and any necessary site inspections of several structures on multi-million dollar construction projects, including fossil and nuclear power plants, and paper mills. Major projects include: Nine Mile Point Nuclear Power Plant, Millstone Nuclear Power Plant, and Great Northern Paper Company. Types of structures under jurisdiction include all buildings, nuclear containments, foundations for vibrating equipment, towers, tanks, and cable trays. Received extensive training in personnel management, estimating, scheduling, contract management and computer analysis, including structural analysis programs such as SAP, STRUDL, STARDYNE and ANSYS.

**CITY OF MALDEN ENGINEERING DEPT:**
**(1975-1978)**

**As Engineering Aide**

Responsible for field inspection of municipal construction, including installation and repair of roadways, sidewalks, sewer and water mains. Experience in municipal surveying, including road layout, city boundary surveys, and location of underground utilities.

**EDUCATION:**    University of Lowell - Bachelor of Science in Civil Engineering 1978

**MEMBERSHIPS:**    Board of Directors – Massachusetts Building Commissioners and Inspectors Association
American Society of Civil Engineers (ASCE)
Building Officials and Code Administrators, International (BOCA)
National Fire Protection Association (NFiPA)
Massachusetts Building Commissioners and Inspectors Association (MBCIA)

**Resume of S.R. Frederickson/Page 3 of 3**

**LICENSES:**        Registered Professional Engineer – Massachusetts
Registered Professional Engineer – New Hampshire
Registered Professional Engineer – Maine
Registered Professional Engineer – Connecticut
Commonwealth of Massachusetts Certified Inspector
of Buildings/ Building Commissioner
Massachusetts Emergency Management Agency (MEMA) certified post-
disaster building evaluator

**COMMITTEES:**        Member American Society of Civil Engineers (ASCE) Technical
Council on Forensic Engineering
Past Member ASCE Standards Writing Committee on Structural
Condition Assessment of Existing Buildings
Past Member ASCE Subcommittee on Condition Assessment of the
Building Envelope
Past Member ASCE Subcommittee on Seismic Rehabilitation of Existing
Buildings
Past Member Building Officials and Code Administrators International
(BOCA) Ad Hoc Committee for Repair of Existing Buildings

**SUMMARY OF TESTIMONY**
Steven R. Frederickson, P.E.
October 27, 2005

1.  Clarida Dela-Cruz v. Elena Chazulle-Colon, Attorney McNaught, Moriarty & McNaught - Expert testimony on 1/14/95 in Lawrence Housing Court. Testimony was for the defendant on a trip-and-fall on an interior threshold.

2.  Maria Consolino v. Whittier Partners, Attorney Iannella & Mummolo - Expert testimony on 10/17/95 in Suffolk Superior Court. Testimony was for the plaintiff regarding a slip on a wet marble exterior floor

3.  Gary MacDonald v. Joseph Salem, Attorney Iannella & Mummolo - Expert testimony on 1/26/96 in Lowell Superior Court. Testimony was for the plaintiff regarding a fall on an interior stairway

4.  Brian Piercey v. American Home Inspection, Inc., Attorney Ballin & Levine - Expert testimony on 3/6/96 in Malden District Court regarding an improper pre-purchase home inspection

5.  Rimma Vaks v. James Miller - Testimony for plaintiff regarding quality of construction for residential addition - Testimony on 10/26/98 at Waltham District Court

6.  Craig Burnham v. City of Salem, MA - Salem District Court - Expert testimony for plaintiff on 12/8/99 on the use of driven piles.

In addition, I have given testimony in three arbitrations: one regarding wind-driven rain damage to a house in Revere, one regarding a collapsed warehouse roof truss in Franklin, MA, and one regarding a collapsed barn roof in Plympton, MA. In June, 1999 I gave a deposition on a Lewiston Maine mill building roof collapse.

Finally. I was called to testify on Kerry Kelly v. Brinderson Corporation, Attorney Iannella & Mummolo, on behalf of the plaintiff regarding an injury due to a trench collapse on a construction site. I appeared in Lawrence Superior Court on 9/20/95, but the case was settled immediately prior to my testimony.

# Liberty Architectural Associates, Inc.

**Architecture, Planning, Interior Design**

1599 Washington Street, Braintree, MA 02184
Tel: (781) 848-7134
Fax: (781) 848-7135
E-mail: Mike@LibertyArchitectural.com
www.LibertyArchitectural.com

October 27, 2005

Tory A. Weigand
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210

Re: Judith Thibeau VS. East Boston Neighborhood Health Center

Dear Mr. Weigand:

Enclosed please find my written report with regard to the above-captioned matter. In preparing my report, I have reviewed the following:

- Deposition of Judith Thibeau
- Deposition of Dennis Buchieri
- Plaintiff's expert report of Herbert W. Eisenberg, AIA
- 780 CMR The Massachusetts State Building Code, State Board of Building Regulations and Standards, Sixth Edition
- 521 CMR Architectural Access Board
- Life Safety Code Handbook, eighth edition.
- American with Disabilities Act, 1990 (ADA)
- American with Disabilities Architectural Access Guidelines (ADAAG)

I have been a registered architect for twenty years. I have extensive experience with various building codes including but not limited to the Massachusetts State Building Code and have extensive knowledge of the Americans with Disabilities Act, the American with Disabilities Architectural Access Guidelines and the CMR 521 Architectural Access Board.

The last revision to the Building Code became effective this year on September 9, 2005. When revisions are made to the Building Code new building construction is required to meet the revised standards. Existing buildings such as the building located at 79 Paris Street, East Boston are not required to be altered to meet the revised standards.

I inspected the premises and stairwell at 79 Paris Street East Boston. The building was constructed in 1925 and is part of the East Boston Neighborhood Health Clinic. It is an existing building under the codes and is not required to be upgraded to meet any current code requirements.

1

# Liberty Architectural Associates, Inc.

Architecture, Planning, Interior Design

1599 Washington Street, Braintree, MA 02184
Tel: (781) 848-7134
Fax: (781) 848-7135
E-mail: Mike@LibertyArchitectural.com
www.LibertyArchitectural.com

I viewed the stairway in which Mrs. Thibeau allegedly fell, took photographs and measured several components of the stairway including treads, risers, handrail height, and stair width and also became generally familiar with the ambient conditions of the stair such as the lighting, the noise level, and the number of people using it.



*Picture No. 1 - View of Stairs from First Floor Intermediate Landing*

The stairs are well lit and easy to use. They are well-maintained, designed and constructed. The steps are constructed of terrazzo. The handrails are made of wood. The railing on the in side or outer handrail have iron balusters. A current Certificate of Inspection was signed by the Building Inspector and posted at the bottom of the stairs. The height of the risers and the depth of the treads were 7" and 11". The height of the handrail was approximately 34" and the diameter of the handrail was approximately one and one-half inches. The width of the stair was 4'-8".

The building has an elevator. The elevator door was easily visible at both the first and second floor levels. The Elevator control buttons are only 12" from the stair and the elevator door only 20" from the stair on the second floor.

2

# Liberty Architectural Associates, Inc.

Architecture, Planning, Interior Design

1599 Washington Street, Braintree, MA 02184
Tel: (781) 848-7134
Fax: (781) 848-7135
E-mail: Mike@LibertyArchitectural.com
www.LibertyArchitectural.com



*Picture No. 2 - Curved Handrail at the Bottom of the Stairs*

The inner or outside handrail to the stairway curved slightly and leveled off approximately 5" from the end, signaling that the handrail was about to end. The handrail ends at the end of the last tread but does not extend beyond the bottom-most tread of the stair. .

Altering the existing handrail as suggested in Mr. Eisenberg's expert report so that the handrail continues to slope one tread beyond the last riser plus 12" is not readily achievable and thus not required by the ADA and would otherwise create a potential safety hazard. Simply extending the handrail 23" into the landing would cause the stairway to become non-conforming to the Building Code in a much more hazardous manner and otherwise create a potentially hazardous condition.

3

# Liberty Architectural Associates, Inc.

Architecture, Planning, Interior Design

1599 Washington Street, Braintree, MA 02184
Tel: (781) 848-7134
Fax: (781) 848-7135
E-mail: Mike@LibertyArchitectural.com
www.LibertyArchitectural.com



*Picture No. 3 - Location of Bottleneck if Handrail Were Extended*

In order to insure the safe and orderly exit from the building in an emergency, the building code requires that the stairs shall not reduce in width in direction of egress travel. Altering the handrail so that it projects 23" into the landing would reduce the width of the landing on the first floor to a dimension that is less than the width of the rest of the stair thus creating a bottleneck at the bottom of the stair.

It has been documented that a reduction in the width of the path of egress causes people to panic, fall down, push each other and trample one another in order to get by the obstacle (in this case the handrail) that prevents them or slows them down while exiting the building in the event of a fire, terrorist attack or other catastrophe. Reducing the width of the stair also make's it more difficult for firemen, policemen and paramedics to access the building during the emergency. I note that under the Massachusetts Architectural Access Board regulations, handrail extensions are not required where it would create a hazardous condition or space would not permit such an extension.

4

# Liberty Architectural Associates, Inc.

Architecture, Planning, Interior Design

1599 Washington Street, Braintree, MA 02184
Tel: (781) 848-7134
Fax: (781) 848-7135
E-mail: Mike@LibertyArchitectural.com
www.LibertyArchitectural.com

In his expert report Mr. Eisenberg states that there were no directional signs to the elevator door at the second floor lobby and that there is a sign directing people to use the stairs. Mr. Eisenberg also states that as you leave the eye clinic the stairs are straight ahead and the elevator is a sharp turn to the right. Mr. Eisenberg's description is not entirely accurate. The exit rout from the Eye Center on the second floor to the first floor exit is as follows. As you exit from the Eye Center's double doors the stairway leading up is directly in front of you. To use the stairs to go down you must turn right and upon doing this you will see the stairs leading down, the elevator door and elevator landing directly in front of you. Accordingly, a sign is not necessary since the elevator is directly in front of you as you walk to the stairway. If you choose to use the stairs instead of the elevator you must turn left approximately two feet (2'-0") before you get to the elevator doors. You will also see the sign that Mr. Eisenberg describes as leading people down the stairway at this time.



*Picture No. 4 – View of Elevator, Stair and Sign Upon Turning Right After Leaving the Eye Center*

5

# Liberty Architectural Associates, Inc.

**Architecture, Planning, Interior Design**

1599 Washington Street, Braintree, MA 02184
Tel: (781) 848-7134
Fax: (781) 848-7135
E-mail: Mike@LibertyArchitectural.com
www.LibertyArchitectural.com

The purpose of the sign is to direct firemen and emergency personnel in the event of an emergency.  The Life Safety Code in Section A.7.2.2.5.4 states that "stairs serving five or more stories shall be provided with signage within the stair enclosure at each floor landing.  The signage shall indicate the story, the terminus of the top and bottom of the stair enclosure and the identification of the stair enclosure.  The signage also shall state the story of, and the direction to the exit discharge."  The intent of this provision is to provide vital egress information to the occupants of a building and to fire fighters as they exit or attempt to make rescues in the confusion of a fire or terrorist attack.  The signs that are located in the stairwell and shown in exhibit 7 are similar to those shown in the Life Safety Code.  (See attached page of the Life Safety Code Handbook.)

In conclusion, it is my opinion that the stairwell and accompanying handrails do not violate any codes.  Even though the building does not need to comply with current code requirements, the stairwell and handrails substantially comply with the existing codes.  The stairwell and handrails are well constructed, designed and maintained.  They do not pose a safety hazard and are safe and reasonable for their intended use.  It is my opinion that not only is a handrail extension not required by any applicable code but the lack of a handrail extension on the inner or open side of the stairwell did not create an unsafe condition or otherwise cause Mrs. Thibeau to fall.  Indeed, extending the handrail is not readily achievable and would cause a potential safety hazard as it would reduce the landing at the first floor and impede access to and from the stairwell given the location of the stairs, landing, and the layout of the building.  Further, according to Mrs. Thibeau's testimony, she states that while walking down the stairs and prior to her fall she took her hand off the handrail a number of inches before the handrail ended.  Accordingly, any extension of the handrail would not have prevented her fall.

It is my opinion that there is no requirement to post any signage indicating the presence of an elevator.  The elevator is located close to the stairwell and is easily seen from both the first and second floors of the stairwell.  The elevator is open and obvious.  The lack of any signage indicating the presence of an elevator had nothing to do with Mrs. Thibeau's fall.

Sincerely yours,

Michael R. Contre, RA
Principal
Liberty Architectural Associates, Inc.

6

**Liberty Architectural Associates, Inc.**

Architecture, Planning, Interior Design

1599 Washington Street, Braintree, MA 02184
Tel: (781) 848-7134
Fax: (781) 848-7135
E-mail: Mike@LibertyArchitectural.com
www.LibertyArchitectural.com



Exhibit 7.41 Enclosed, usable space under flight of stairs.



Exhibit 7.42 Stair sign details.



Exhibit 7.43 Stair sign placement.

A.7.2.2.5.4 The intent of this provision is to provide vital egress information to the occupants of a building and to fire fighters. To reduce information overload to occupants during emergency egress, a sign indicating the floor level of and the direction to the exit discharge is permitted to be placed as a separate sign with another sign indicating the floor level, the terminus of the top and bottom of the stair enclosure, and the identification of the stair.

The provisions of 7.2.2.5.4 require the posting of important information at each floor landing in each stairwell if the stair serves five or more stories. The term *signage* is used to signify that the required information might appear on multiple signs mounted adjacent to each other. The information is for fire-fighting personnel and building occupants in an emergency. The information most helpful to fire fighters can be put on one sign, and the information most useful to occupants on another. See A.7.2.2.5.4.

The signage must identify the stair, indicate the floor level of the landing and where the stairwell terminates at the top and bottom, and identify and show the direction to the exit discharge. Exhibit 7.42 is an example of a single sign providing all the required information. Exhibit 7.43 illustrates the placement required to ensure that the sign is readily visible whether the door is in the open or closed position.

The indication of the direction to the level of exit discharge can be extremely useful to occupants of a building, especially if they are located below the level of exit discharge. The natural tendency of occupants is to attempt egress by traveling downward in a stair; this is counterproductive where the exit discharge is located on an upper level. Also, many buildings have multiple levels of entrance, which creates confusion with respect to travel direction in a given stair.

The requirements of 7.2.2.5.4 are not exempted for existing buildings, because it is feasible and cost effective to install signs providing the requested information. Because stair enclosures are usually not as aesthetically well finished as occupied portions of

LIBERTY ARCHITECTURAL



**Michael R. Contre**
**Principal Architect**
**Liberty Architectural Associates**

As president of Liberty Architectural Associates, Inc., Mr. Contre oversees a team of architects, engineers, designers and draftsmen. You will observe that he is deeply involved in architectural design, and is responsible for the management of all projects and client contacts. It is his goal to increase the growth of his company by providing excellent customer service coupled with an ever expanding knowledge and understanding of his clients goals and aspirations.

Clients find him responsible for complete Planning, Architecture, Architectural Engineering, and Interior Fit-ups for private companies and public agencies. Much of his experience has involved the renovation and rehabilitation of existing buildings. His modifications to existing building have helped companies grow or downsize; have repaired the effects of age and weather on structures; and have modernized aging structures to meet the needs of today's ever changing technological demands. Mr. Contre has displayed the ability to survey and document the existing conditions, suggest necessary modifications and enhancements and provide architectural and engineering services from preliminary stages of the project to final construction. Mr. Contre has been fortunate to be able to work with clients who required adding additional theaters to Multi-plex Cinemas; Rehabilitating Navel Barracks in Key West, Florida; adding infra-structure to regional post offices in Providence, R.I.; modernization of a Dupont manufacturing facilities in Old Hickory, Tennessee and Circleville Ohio; and new construction of a Pharmaceutical Manufacturing Facility in Andover, MA to name a few. Client references endorse Mr. Contre's commitment to complete service and creative and technical excellence.

Mr. Contre is a Graduate of the University of Miami with a Bachelor of Architecture Degree and has over 25 years of varied experience in the Architectural Field. He has earned a reputation as an innovative and highly technical architect and has taken part in projects in several states including Massachusetts, Rhode Island, New York, Ohio, Florida, Georgia, Mississippi and Tennessee and Jerusalem, Israel. As a member of the National Council of Architectural Registration Boards (NCARB) he is able to obtain a license to work anywhere in the United States and has held licenses in Massachusetts, Rhode Island and Maryland.

Mr. Contre has worked on numerous projects involving new construction including Office Buildings, Manufacturing Facilities, Pharmaceutical Facilities, Mid-Rise Apartment Buildings, Parking Garages, Maintenance Facilities, Retail Malls, Condominiums, Apartment Buildings and Residences.

**LIBERTY ARCHITECTURAL**

In addition, Mr. Contre is has also taken part in community service, and has been an active member in the Kiwanis Club, the Boston Society of Architects, and the American Institute of Architects. Mr. Contre is an active member of the Rotary Club.

Prior to Liberty Architectural Associates Mr. Contre worked for several large full services architectural and engineering firms in Boston, Providence, Cleveland and Miami. A partial list of Companies that Mr. Contre has worked with includes MK Ferguson Group, Elkus/Manfredi, Parsons Main, Raytheon Engineers and Constructors, DuPont, Ganteaum and McMullen, and National Amusements.

## Partial List of Recent Clients and Projects

**United States Postal Service Distribution Center Renovations,** Providence, RI
Shevelier Associates
Raynham, MA

**Tow Truck Manufacturing Facility**
Gutierrez Construction Co., Inc.
One Wall Street
Burlington, MA 01803

**Lester, MA Police Station Study**
Maguire Group Inc.
Foxborough, MA 02035

**Ritz Carlton, Hotel Renovation**
Elkus/ Manfredi Architects
Boston, MA

**Pacific Place Mall - Seattle, Washington**
Elkus/Manfredi Architects
Boston, MA

**Showcase Multi-Plex Cinema - National Amusements - Warwick, MA**
Beacon Architectural Associates
Boston, MA

**U.S. Naval Base Barracks Renovations Key West Florida**
Norman Giller Associates
Miami Beach, Florida

**Manet Community Health Center @ Snug Harbor**
Squantum Street
Quincy, MA 02171

**Eye Health Services,** Pembroke, MA
Crown Colony Business Park
Quincy, MA

**Gillette Stadium Code Review**
Maguire Group, Inc.
Foxborough, MA

**Bay Colony Corporate Center, Phase IV Waltham, MA**
Elkus/ Manfredi Architects
Boston, MA

**Showcase Multi-Plex Cinema - National Amusements - Lawrence, MA**
Beacon Architectural Associates
Boston, MA

**Copley Place Galleria Mall, Boston - Monumental Stair Additon**
Elkus/ Manfredi Architects
Boston, MA

**New York Times Printing Facility**
**Bronx, New York**
Parson-Main, Boston, MA

**Ryder Truck Rental,** Atlanta, Georgia
Lawrence Brill Engineers
Coral Gables, Florida

**Northbridge, MA Police Department Study**
Consulting Architect for Maguire Group Inc.
Foxborough, MA 02035

**Patriots Football Stadium, Foxboro, MA**
Consulting Architect for Maguire Group, Inc.
Foxborough, MA 02035

**Whitinsville Building Department Study**
Consulting Architect for Maguire Group, Inc.
Foxborough, MA 02035

**DuPont Industrial Facility**
**Old Hickory, Tennessee**
MK-Ferguson Group
Cleveland, Ohio

**Custom Construction Co., Inc.**
Quincy, MA 02169

**Domino's, Inc.,** South Main Street, Brockton, MA
South Shore Pizza Company
Quincy, MA

**Burger King Restaurants**
Miami, Florida

**IBM Computer Labs Renovations**
**Poughkeepsie, NY**
Parson-Main, Boston, MA

**West Marine,** Gloucester, MA
500 West Ridge Drive
Watsonville, CA

**Shops at North Michigan Avenue Mall, Chicago, IL**
Elkus/ Manfredi Architects
Boston, MA

**Sansom Common, Univ. of Pennsylvania**
Elkus/ Manfredi Architects
Boston, MA

**Ryder Truck Rental, Tupelo, Mississippi**
Lawrence Brill Engineers
Coral Gables, Florida

**DuPont Industrial Facility Circleville, Ohio**
MK-Ferguson Group
Cleveland, Ohio

**Kodak Industrial Park Renovations**
**Buffalo, New York**
MK-Ferguson Group
Cleveland, OH

**EISAI Pharmaceutical Facility, Andover, MA**
Raytheon Engineers and Constructors
Boston, MA

**Addition to Boston Globe Building**
Ganteaum and McMullen
Chauncey Street
Boston, MA

**Domino's, Inc.,** Quincy Avenue, Quincy MA
South Shore Pizza Company
Quincy, MA

**McDonald's Restaurants**
Quincy, MA

**Sheraton Hotel, Jerusalem, Israel**
Morris Lapidus Associates
Miami Beach, Florida

**West Marine,** Falmouth, MA
500 West Ridge Drive
Watsonville, CA

**West Marine,** Plymouth, MA
500 West Ridge Drive
Watsonville, CA

LIBERTY ARCHITECTURAL

**West Marine,** Braintree, MA
500 West Ridge Drive
Watsonville, CA

**U.S. Boat,** Weymouth, MA
500 West Ridge Drive
Watsonville, CA

**Domino's, Inc.,** North Main Street, Brockton, MA
South Shore Pizza Company
Quincy, MA

**Andrade Beach Residence**
**On Cape Cod, MA**
Mattapoisett, MA

**Domino's, Inc.,** Hancock Street
South Shore Pizza Company
Quincy, MA

**Peruzzi Dental Offices**
Rt. 3A
Hingham, MA