UNITED STATES DISTRICT COURT
for the
EASTERN DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JUDITH THIBEAU, | ) | |
| And GEORGE THIBEAU, | ) | |
|     Plaintiffs | ) | |
| | ) | |
| VS. | ) | **CIVIL ACTION** |
| | ) | **NO. 04-10643 LTS** |
| UNITED STATES OF AMERICA | ) | |
| and EAST BOSTON NEIGHBORHOOD | ) | |
| HEALTH CENTER CORPORATION, | ) | |
|     Defendants | ) | |

**DEFENDANT EAST BOSTON NEIGHBORHOOD HEALTH CENTER
CORPORATION'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**I.     STATEMENT OF UNDISPUTED MATERIAL FACTS[1]**

    *a.     The Parties And Building At 79 Paris Street*

1.     The defendant, East Boston Neighborhood Health Center ("EBNHC"), is a non-profit, charitable organization which provides healthcare services to the Chelsea, Revere, East Boston and Winthrop community.  See Affidavit of James Taylor, M.D. (**Exh. A**); Taylor Depo. at 85-88;  (**Exh. B**).

2.     EBNHC's express mission is to "provide easily accessible, affordable, appropriate, high quality, personalized, coordinated primary care for all who live and work in East Boston and the surrounding communities without regard to age, income, insurance status, language, culture or social circumstances.  (Exh. 1 to Taylor Aff. (**Exh. A**).

3.     The EBNHC is also a federally subsidized health center under the  Federally Supported Health Centers Assistance Act.  Taylor Depo at 42 (**Exh.  B**).  The EBNHC is funded by a number of sources including federal grants, public payors such as Medicare and Medicaid

---

[1] EBNHC submits the following facts as undisputed for purposes of this motion only and reserves the right to contest any fact at any trial.

and from the Free Healthcare pool program created by the state.  Taylor Aff. at ¶ 5.  (**Exh. A**).

Approximately forty (40%) percent of the patients that are provided medical care at EBNHC are

uninsured and qualify for free care under the free care program.  Taylor Aff. at ¶ 9 (**Exh. A**).

4.      The EBNHC is a lessee of a building located at 79 Paris Street, East Boston,

Massachusetts.  Taylor Aff. at ¶ 8 (**Exh. A**); Taylor Depo. at 13-15 (**Exh. B**); see also EBNHC

Lease for 79 Paris Street (**Exh. C**).

5.      The 79 Paris Street building is owned by the Trustees of the Robert White Fund

which leases the building to the City of Boston, which, in turn, leases to the EBNHC for a

nominal sum of $1.00 per year.  See Taylor Aff. at ¶ 8 (**Exh. A**); Taylor Depo. at 13-15 (**Exh.

B**); (**Exh. C**).

6.      The George Robert White Fund is a permanent charitable trust dedicated to

"creating works of public utility and beauty for the use and enjoyment of the inhabitants of the

City of Boston" and one of the properties held in the trust is the 79 Paris Street Building.  See

EBNHC/George Robert White Fund Lease for 79 Paris Street (**Exh. C**); Taylor Aff. at ¶ 8

(**Exh. A**).

7.      Under the lease for 79 Paris Street, EBNHC is required to operate a health clinic

including services for healthcare, counseling and social services.  (**Exh. C** at page 2); Taylor Aff.

at ¶ 8 (**Exh. A**).

8.      The 79 Paris Street building is a three story building.  On the second floor there is

an eye clinic or vision center and a dental clinic and on the first floor there is an HIV clinic

referred to as Project Shine.  Bucchieri Depo. at 52-53 (**Exh. D**); Taylor Depo. at 21-22

(**Exh. B**).  The third floor houses the medical staff office that handles credentialing.  Taylor

Depo. at 22-23 (**Exh.  B**).

9.     The eye clinic or vision center is a department of the EBNHC. Taylor Depo. at 32 (**Exh. B**).

10.     The plaintiffs, Judith Thibeau and George Thibeau reside at 53 Chauncer Street, East Boston.  J. Thibeau Depo. at 6 (**Exh. E**).

11.     Both Judith Thibeau and George Thibeau have received health services including eye care for many years from the EBNHC.  J. Thibeau Depo. at 8-11, 21-22 (**Exh.  E**) G. Thibeau Depo. at 7-9 (**Exh. F**)

12.     George Thibeau is a retired claims unit manager for Travelers Insurance Company.  G. Thibeau Depo. at 5 (**Exh. F**).

13.     Judith Thibeau first obtained eye care at the eye clinic at 79 Paris Street in the early 1990's.  J. Thibeau Depo. at 23 (**Exh. E**).  She would receive routine eye care approximately every two years.  Id. at 24-25; 43-44 (**Exh. E**).

14.     Mr. Thibeau had likewise had regular eye exams at the vision center and had been to the center many times prior to September 26, 2002. G. Thibeau Depo. at 9-12 (**Exh.  F**).

15.     She began wearing eye glasses in 1995 for reading purposes.  J. Thibeau depo. at 24-25; 43-44 (**Exh. E**).  The prescription was changed once.  Id.

16.     Mrs. Thibeau was at the 79 Paris Street building at least five or six times prior to her visit on September 26, 2002.  J. Thibeau depo. at 25 (**Exh. E**).

17.     Mrs. Thibeau was scheduled for a regular eye examination and was scheduled to have her eyes dilated with drops on September 26, 2002.  J. Thibeau depo. at 26 (**Exh. E**).

18.     Prior to the September 16, 2002 eye appointment, Mrs. Thibeau had her eyes dilated as part of a regular eye examination at the Eye Clinic at 79 Paris Street on at least two prior occasions.  J. Thibeau at 30-37, 41 (**Exh. E**).

971204v1

19.     On each of the eye appointments where Mrs. Thibeau had her eyes dilated she would arrange to have a family member accompany her and drive her back from the appointment. J. Thibeau Depo. at 26-33 (**Exh. E**).[2]

20.     Prior to the September 26, 2002 visit, Mr. Thibeau had her eyes last dilated at the clinic in June, 2002 and she was diagnosed with a cataract in one of her eyes. J. Thibeau Depo. at 29, 41 (**Exh. E**).

21.     Prior to September 26, 2002, Mrs. Thibeau had blurry vision in her left eye (with the cataract) and was sensitive to light. She could not drive at night but did drive regularly during the day and did not use or need her glasses to drive. J. Thibeau Depo. at 32-33; 50 (**Exh. E**).

22.     In all of her visits to the eye clinic at 79 Paris Street over the years, Mrs. Thibeau always used the stairs. J. Thibeau Depo. at 36; 42-43 (**Exh. E**).

23.     At no time at any of those prior visits (i.e., prior to September 26, 2002) did Mrs. Thibeau have any  difficulty or problem using the stairs including  those occasions (at least twice) where she had her eyes dilated as part of a regular eye examination. J. Thibeau Depo. at 36-37, 42 (**Exh. E**).

24.     Mrs. Thibeau testified that she did not believe it was dangerous or unsafe to go down the stairs following her appointments including those appointments when she had her eyes dilated. J. Thibeau Depo. at 27 (**Exh. E**).

25.     On September  26, 2002, Mrs. Thibeau came to the eye clinic at 79 Paris Street with her husband George Thibeau for her appointment. J. Thibeau Depo. at 46 (**Exh. E**).

---

[2] Mr. Thibeau also testified that he had been to the eye center several times before September 26, 2002 and had his eyes dilated two maybe three times prior to his wife's accident. G. Thibeau Depo. at 13-15 (**Exh. F**).

26.    Mrs. Thibeau had her eyes examined and dilated with drops and was seen by the eye surgeon.  J. Thibeau Depo. at 46. (**Exh. E**).

27.    Following the appointment, Mrs. Thibeau left the clinic accompanied by her husband, Mr. Thibeau.  J. Thibeau Depo. at 58 (**Exh. E**).

28.    Mr. Thibeau came with Mrs. Thibeau to accompany her and to drive her home.

29.    She and her husband proceeded to use the stairwell – the same stairwell she had used in all of her other visits to the eye clinic.  J. Thibeau Depo. at 58 (**Exh. E**).

30.    Mrs. Thibeau proceeded down the stairwell with Mr. Thibeau at her side and approximately four or five steps from the end of the stairwell, Mr. Thibeau left Mrs. Thibeau so he could use the bathroom.  J. Thibeau Depo. at 59, 79, 80.  (**Exh. E**); G. Thibeau Depo. at 26-30 (**Exh. F**).

31.    Mrs. Thibeau claims she was going down the stairs slowly and holding the railing on her left side (as opposed to the railing on the wall) with her left hand.  J. Thibeau Depo. at 60, 61 (**Exh. E**).

32.    Mrs. Thibeau did not recall looking down at her feet and where she was stepping before she fell.  J. Thibeau Depo. at 64-65 (**Exh. E**).

33.    Mrs. Thibeau had no trouble seeing the handrail and had no problems with the lighting when she walked down the stairs.  J. Thibeau Depo. at 65; 150 (**Exh. E**).  She recalls her left eye was blurry but that if she looked down at her feet she could see her feet, that she could see the steps of the stairs when looking down; and yet she could see the handrail she used while walking down the stairs.  J. Thibeau Depo. at 149-150 (**Exh. E**).

34.    Mr. Thibeau, who had come to the clinic to accompany and assist his wife including driving her home, walked down the stairs with Mrs. Thibeau. He walked next to her

971204v1

until the last four or five steps where he left her and went ahead of her to use a bathroom.  G. Thibeau Depo. at 25-26 (**Exh. F**).

35.    Mrs. Thibeau testified that she took her left hand off the handrail she was holding four to six inches before the handrail ended before she fell.  J. Thibeau Depo. at 76-77; 69-71; 78 (**Exh. E**); G. Thibeau Depo. at 55-56 (**Exh. F**).

36.    Mrs. Thibeau claims to have missed the last step and does not recall ever stepping on the last step of the stairwell.  J. Thibeau Depo. at 71 (**Exh. E**).

37.    When shown photographs of the stairwell at 79 Paris Street, Ms. Thibeau specifically identified where she removed her hand from the handrail which confirmed that she took her hand off the handrail four to six inches before the handrail ended before she fell.  J. Thibeau Depo. at 69, 78 (**Exh. E**) and (**Exh. G**).

38.    Mr. Thibeau did not see Mrs. Thibeau fall as he had gone ahead of her to look for a bathroom before she fell.  G. Thibeau Depo. at 25-26;29-30  (**Exh. F**).  He did turn in time to see her in "flight" before she hit the ground.  G. Thibeau Depo. at 25-26; 29-30  (**Exh. F**).

39.    Mrs. Thibeau claims not to have known that 79 Paris Street had an elevator although it is located only a few inches/feet from the stairwell on both the first and second floor of 79 Paris Street.  J. Thibeau Depo. at 72-76; 152 (**Exh. E**); <u>see</u> photographs (**Exh. G**).

40.    At none of her visits at the clinic over the years including on September 22, 2002, did Mrs. Thibeau ask if there was an elevator.  J. Thibeau depo. at 66 (**Exh. E**); G. Thibeau Depo. at 25 (**Exh. F**).

41.    Neither Mr. or Mrs. Thibeau ever expressed any concern to anyone at EBNHC to using the stairwell after having their eyes dilated as part of their regular eye examination.  J. Thibeau Depo. at 67 (**Exh. E**).

6

42.    The EBNHC is not aware of and has never been notified of any falls by any patients or visitors as to the stairwell at 79 Paris Street prior to September 26, 2002.  J. Thibeau Depo. at 67 (**Exh. E**); Taylor Depo. at 64 (**Exh. B**); Buchieri Depo. at 119-120 (**Exh.  D**).

43.    As a result of the fall, Mrs. Thibeau sustained a fractured ankle and was taken by ambulance to the New England Medical Center.  J. Thibeau Depo. at 86 (**Exh. E**).

44.    Mrs. Thibeau testified that she understood and knew that she needed to watch for her own safety and look where she was walking.  J. Thibeau Depo. at 151-153 (**Exh. E**).

45.    The elevator was located only a few inches/feet from the stairwell and can be seen both at the first floor and second floor stairways.  See photographs (**Exh. G**).

46.    Plaintiffs recently designated an "expert", Mr. Eisenberg, who in his report claims that while the building code is inapplicable to the building (79 Paris Street) as it is grandfathered, the handrail on the stairwell was nonetheless defective because it should have extended beyond the end of the stairs.  See (**Exh. J**).

## ARGUMENT

**II.    The Standard**

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  A "genuine" issue is defined as one for which "the evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, [is] sufficiently open-ended to permit a rational fact finder to resolve the issue in favor of either side."  National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 734 (1st Cir. 1995) (citation omitted).  A fact is "material" if it "has the potential to

alter the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 428 (1st Cir. 1996).

Once the moving party demonstrates the "'absence of evidence to support the nonmoving party's case,' the burden of production shifts to the nonmovant." Dow v. United Brotherhood of Carpenters, 1 F.3d 56, 58 (1st Cir. 1993) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)). The nonmovant must then "affirmatively point to specific facts that demonstrate the existence of an authentic dispute." McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995). The "court must 'view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor,' but paying no heed to 'conclusory allegations, improbable inferences, [or] unsupported speculation.' If no genuine issue of material fact emerges, then the motion for summary judgment may be granted." Id. (citations omitted).

### III.   Expert Opinion Admissibility Rules

The principles governing the admissibility of expert opinions is well-plowed. See Daubert v. Merrill Dow Pharms. Inc., 509 U.S. 579 (1993); Kuhmo Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999); General Elec. Co. v. Joines, 522 U.S. 136 (1997); see also Koken v. Black & Ventch Consts., Inc., 2005 U.S. App. LEXIS 22193 (October 14, 2005) (judgment properly entered for defendant as plaintiffs' proffered expert opinion barred by Daubert principles). A federal trial judge is to act as "gatekeeper" and carefully scrutinize proffered expert testimony. As the First Circuit recently re-emphasized, "Daubert requires, with respect to expert testimony, 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts at issue." Koken, 2005 U.S. App. LEXIS at 22193 citing Daubert, 509 U.S. at 592-93; see Hochen v. Bobst Group, Inc., 290 F.3d 446, 452 (1st Cir. 2002); see also Allison v. Meghan

Medical Corp., 184 F.3d 1300, 1311-12 (11th Cir. 1999) ("the judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion; and its lack of probative value"). "The ultimate purpose of the Daubert inquiry is to determine whether the testimony of the expert would be helpful to the jury in resolving a fact in issue." Cippollone v. Yale Indus. Prod. Inc., 202 F.3d 376, 380 (1st Cir. 2002). This gate keeping obligation applies to all expert testimony, not only scientific experts. Kuhmo Tire, 526 U.S. at 137.

The Daubert inquiry consists of both a reliable and relevance prong. Expert testimony is admissible when (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence and facts in the particular case attached. Kuhmo, 526 U.S. 137, 119 S. Ct. 1167; General Elec. Co. v. Joiner, 522 U.S. 136, 118 S. Ct. 512 (1997); Daubert, 509 U.S. at 589-91, 113 S. Ct. at 2795; see also Koken v. Blach & Veatch Constr., Inc., 2005 U.S. App. LEXIS 22193 (October 14, 2005) (expert's opinion must be applicable to facts of the case).[3]

The second prong under Daubert is relevance and requires the court to determine whether expert testimony "assists the trier of fact in understanding the evidence or determining a fact in

---

[3] As to the reliability prong, the central inquiry must focus upon the expert's principles and methodology. Daubert, 509 U.S. at 595, 113 S. Ct. at 2797; Lanigan, 419 Mass. at 26. The proffered expert testimony must be "scientific," that is, that it pertains to "scientific knowledge" and is based upon a scientific methodology. The trial court is to rule out testimony based upon "subjective belief or unsupported speculation." Daubert, 509 U.S. at 590, 113 S. Ct. at 2795. An expert's bare assurance of validity is insufficient to allow his opinions to proceed to the jury. Rather, the party presenting the expert must be able to show that the expert's findings are based on sound science, which requires some objective, independent validation of the expert's methodology. Daubert , 509 U.S. 579, 113 S. Ct. 2786; General Elec., 522 U.S. 136, 118 S. Ct. at 519 (nothing in Daubert or Rule 702 of the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert); Cipollone v. Yale Industrial Products, Inc., No. 99-1494 (1st Cir. Jan. 28, 2000) (expert's opinion "sheer *ipse dixit*").

issue." Daubert, 509 U.S. at 592, 113 S. Ct. at 2796. Expert testimony must be of "the kind that enlightens and informs lay persons without expertise in a specialized field." United States v. Burchfield, 719 F.2d 356 (11th Cir. 1983); United States v. Smith, 122 F.3d 1344, 1358 (11th Cir. 1997); Cipollone, No. 99-1494 at 9 (expert testimony that does not assist the trier of fact is excludable under Daubert; "to be admissible, [expert's] testimony must have a valid connection to the pertinent inquiry"). Importantly, the proffered testimony must "fit" the case about which the expert is testifying. Daubert, 509 U.S. at 591, 113 S. Ct. 2795-96; Lanigan, 419 Mass. at 26. There must be a logical relationship between the proffered testimony and the factual issues in the case. Daubert, 509 U.S. at 591, 113 S. Ct. at 2796 ("another aspect of relevancy - is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.")

Further, it is black-letter law that expert opinions based on speculation are insufficient for a plaintiff to sustain his or her burden of proof. Damon v. Sun Oil Co., 87 F. 3d 1467, 1474 (1st Cir. 1996). "It is fundamental that expert testimony must be predicated on facts legally sufficient to provide a basis for the expert's opinion … thus an expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation." Id. at 1474; Van Brode Group, Inc. v. Bowditch & Dewey, 36 Mass. App. Ct. 509 (1994); see generally Toubiana v. Priestly, 402 Mass. 84, 91 (1988) (expert's opinion that is mere guess work or conjecture in the form of a conclusion has no evidentiary value); Imbimbo v. Ahrens, 360 Mass. 847 (1971)(expert's opinion as to possibility insufficient as a matter of law: Giannarca v. Everett Aluminum, Inc., 13 Mass. App. Ct. 208, 210 (1982)(expert's opinion as to damages in apartment due to water leakage through roof properly disregarded as no evidence that penetration by water was due to any improper installation); McCarthy v. Hauck, 15 Mass. App. Ct. 603, 607-

09 (1983)(reliance by plaintiff's expert on assumption about nature of endotracheal tube was not supported by evidence); Brownhill v. Kislin, 317 Mass. 168, 170 (1944)(expert opinion that amounts to speculation has no probative value).

As set forth below, the proffered expert opinion of plaintiff's expert Herbert Eisenberg, AIA is inadmissible entitling EBNHC to summary judgment.

### IV.    Mr. Eisenberg's Proffered Expert Opinions Are Inadmissible As a Matter of Law.

In the designated opinion and report of plaintiffs' expert Herbert Eisenberg, Mr. Eisenberg proffers the following:

> [I]t is my opinion based on my experience as an architect and on research related to stairs safety in published codes, articles and books, that the fall and injury to Ms. Thibeau while she was descending the stairs in a usually impaired condition was due to the lack of a handrail extension and also to the failure of the Eye Clinic to instruct persons in an impaired condition to use the elevator and not the stairs … In addition, there should have been a large print warning and directional signs to the second floor lobby for the use of persons with temporary impairment due to treatment.

See (**Exh. J**).

Accordingly, Mr. Eisenberg's opinion is that (a) the handrail used by Mrs. Thibeau in walking down the stairs at the EBNHC eye vision center was defectively designed in that it did not extend beyond the end of the stairs; (b) that Mrs. Thibeau's fall and injury resulted due to the allegedly defective handrail; (c) that the Eye Clinic failed to instruct Mrs. Thibeau to use the elevator and not the stairs; (d) that the failure to so instruct caused Mrs. Thibeau's fall and injury; and (e) that "there should have been large print warning and directional signs to the elevator door … ."

Mr. Eisenberg's opinion that the lack of an extension of the handrail caused Mrs. Thibeau's fall and injury is inadmissible under <u>Daubert</u>. The "opinion" is pure speculation and not in any way based on the facts of the accident as expressly testified to by Mrs. Thibeau.

As set forth above, <u>Daubert</u> and its progeny mandate that the expert's opinion be relevant. <u>Daubert</u>, 509 U.S. at 491; <u>Lanigan</u>, 419 Mass. at 26. To be relevant, the opinion must be based on the actual facts of the case. <u>Id</u>. Further, as with any expert opinion, the opinion cannot be based on speculation. <u>Damon</u>, 87 F.3d at 1474.

Here, Mr. Eisenberg's professed basis for his opinion is his inspection of the stairs. Notably, he does not indicate that he even read Mrs. Thibeau's deposition wherein she testified to how she fell. Also he does not and cannot assert that the handrails were in violation of any applicable code. Indeed, he concedes that the existing building code which requires certain handrails to extend twelve (12) inches beyond the last step do not apply to this building as it was constructed before these provisions were enacted and is grandfathered. See **Exh. J**.

Mrs. Thibeau testified that she had been going and receiving eye care at the eye clinic at 79 Paris Street for at least ten years. J. Thibeau Depo. at 8-11; 21-25; 43-44 (**Exh. E**). She recalled receiving regular eye care at least every two years. <u>Id</u>. She recalled having her eyes dilated as part of her routine eye care at least on two occasions prior to the September 26, 2002 visit. <u>Id</u>. at 30-37; 41 (**Exh. E**). She always used the stairs when at 79 Paris Street and never had any problem or complaint in using the stairs on any other occasion. <u>Id</u>. at 36-37; 42-43; 67 (**Exh. E**).

As to the incident in question, Mrs. Thibeau testified that she was accompanied by her husband at the September 26, 2002 visit and that she walked next to him down the stairs prior to her fall. J. Thibeau Depo. at 59, 79, 80 (**Exh. E**); G. Thibeau Depo. at 26-30 (**Exh. F**). Mr.

Thibeau left Mrs. Thibeau to look for a bathroom while she was still walking down the stairs.  <u>Id</u>.
Mrs. Thibeau claims her eyes were blurry from the dilation but that the lighting for the stairwell
was fine and that she could see her feet, the steps and the handrail while walking.  <u>Id</u>. at 32-33;
36-37; 42, 50 (**<u>Exh. E</u>**).

     Importantly, Mrs. Thibeau testified she was using the inner handrail (not the one against
the wall) as she descended the stairs.  <u>Id</u>. at 60-61; 64-65 (**<u>Exh. E</u>**).  Most notably, she testified
that she took her hand off the inner handrail of the stairs four to six inches before the handrail
ended.  <u>Id</u>. at 76-77; 69-71; 78 (**<u>Exh. E</u>**).  Indeed, she was shown photographs and clearly
marked where she removed her hand from the handrail which confirms that she took her hand off
prior to ever reaching the end of the handrail before she fell.  <u>Id</u>.; <u>see also</u> (**<u>Exh. H</u>**).  This
testimony unequivocally established that she removed her hand well before the railing ended.

     Despite this testimony, Mr. Eisenberg <u>assumed</u> that "Ms. Thibeau arrived at the end of
the handrail."  Based on this erroneous assumption, Mr. Eisenberg goes on to opine that had the
handrail extended beyond the end of the stairs, Mrs. Thibeau would not have fallen.  Mr.
Eisenberg's opinion is thus not based on the true and actual facts of the case which is a
particularly compelling deficiency given that Mr. Eisenberg does not identify that he even read
Mrs. Thibeau's deposition as part of his report.  Even if he did rely on Mrs. Thibeau's
deposition, since Mrs. Thibeau testified she took her hand off the handrail four to six inches from
the end of the handrail before she fell, the "expert opinion" that Mrs. Thibeau would not have
fallen had a handrail been extended has no basis in the facts of the case.

     Accordingly, there is no relevant or reliable basis for the "opinion" of Mr. Eisenberg that
a longer handrail would have prevented her fall and injury.  A longer handrail could not possibly
have prevented the fall as described by Mrs. Thibeau as she took her hand off the railing well

before reaching the end of the handrail.  To opine or conclude under these facts that an extended handrail would have prevented the fall is pure speculation precluding the admissibility of the opinion as a matter of law.  Accordingly, EBNHC is entitled to summary judgment as plaintiffs cannot make out a *prima face* claim of negligence based on the handrail.

Mr. Eisenberg also proffers the "opinion" that there should have been a warning and/or directional signs telling Mrs. Thibeau where the elevator was.  To the extent this is different from the professional negligence claim as to failure to warn, Mr. Eisenberg provides no basis for such an opinion or how he is competent to offer such an opinion as an "expert."

As an initial matter, Mr. Eisenberg does not and cannot opine that the failure to provide directional signs would have prevented Mrs. Thibeau's accident.  More fundamentally, even assuming that Mr. Eisenberg is competent to provide such an opinion – which he is not – expert testimony is only admissible where the subject is beyond the common knowledge of the jury.  See generally, Fed. R. Evid. 702 (expert testimony only admissible where specialized knowledge will assist the jury to determine fact in issue); Commonwealth v. Francis, 390 Mass. 89, 98 (1983) and other cases cited.  Whether or not warning/directional signs should have been provided as to the location of the elevators and whether they would have prevented the accident is not a subject of specialized knowledge or training and is not the proper subject of expert testimony.

In addition, EBNHC is otherwise entitled to summary judgment as there is no duty to provide such direction and as the presence of the elevator was open and obvious.  See, e.g., Greenslade v. Mohawk Park Inc., 59 Mass. App. Ct. 850, 853 (2003); O'Sullivan v. Snow, 431 Mass. 201, 204 (2000); Toubiany v. Priestly, 402 Mass. 84, 89 (Mass. 1988).  Indeed, it is established that there is no duty to warn where an object is open and obvious.  Id.

14

Notably, while summary judgment is disfavored in negligence actions, this rule is not absolute since the defendant would not have the burden of proof at trial, a defendant could satisfy its burden on a motion for summary judgment by establishing that the plaintiff could not prove an essential element of the claim.  For the plaintiffs to prevail, they must prove the existence of "a legal duty owed by the defendant to the plaintiff, and a breach of that duty proximately resulting in the injury.  O'Sullivan v. Shaw, 431 Mass. 201, 203 (2000), quoting Davis v. Westwood Group, 420 Mass. 739, 742-43 (1995).  Whether a duty exists is a question of law for the court.  Id.

It is clear that a landowner owes a duty of reasonable care to all lawful visitors. O'Sullivan, 431 Mass. at 204.  This duty of reasonable care includes keeping the premises in a reasonably safe condition and to warn against dangers that were known to the defendant.  Hartel v. United States, 2004 U.S. Dist. LEXIS 289242 (D. Mass. 2004 (Gertner, J.) and cases cited affirmed Hartel v. United States, 2005 U.S. App. LEXIS 14779 (July 20, 2005).  (**Exh. I**).  A landowner is "not obliged to supply a place of maximum safety, but only one which would be safe to a person who exercises such minimum care as the circumstances reasonably indicated." Id. and cases cited.  There is no obligation to warn of any risk that would be known to persons of ordinary intelligence.  Id. and cases cited.

Notably, here, the issue is not about warning about a known risk but rather posting directions or warning signs indicating the presence of an elevator.  Plaintiffs have not and cannot cite to any such legal duty.  Even if analogized to the duty to warn of known risks, there is no such duty when the risk is open and obvious.

It is undisputed that the elevator is only a matter of inches/feet from the stairwell on both the first and second floor.  See (**Exh. G**); J. Thibeau Depo. at 72-75 (**Exh. E**).  The photographs

(**Exh. G**) which show the stairs and elevator leave no doubt that the elevator was in plain view and open and obvious.  See e.g., Hartel v. United States, 2004 U.S. Dist. LEXIS 28242 (Gertner, J.)(allegedly defective handrail open and obvious based on photographs submitted to the court entitling defendant to summary judgment on negligence claim) affirmed Hartel v. United States, 2005 U.S. App. LEXIS 14779 (July 20, 2005); (**Exh. I**) Latera v. Buehler, 2000 Mass. Super LEXIS 279 (April 2000)(no duty to warn posed by bench with no handrails as it was open and obvious and summary judgment entered as a matter of law); (**Exh. I**); Toubiano, 402 Mass. at 88-89 (noting duty to maintain elevator in safe condition but finding no duty to protect passenger from obvious danger of using elevator to transport tall items protruding through ceiling).   The fact that Mrs. Thibeau and Mr. Thibeau claim never to have seen or used the elevator in the many times they were in the building is no defense and does not create and issue of fact.  There is simply no duty upon EBNHC to warn or rather advise to the presence of a structure (i.e. elevator) which is open and obvious.  The issue of whether there is a duty is a question of law for the court and there is no such duty under the undisputed facts of the case.  See e.g. O'Connor, 431 Mass. at 204-06 ("the open and obvious rule … operates to negate the existence of a duty of care").

### V.    EBNHC Is Entitled To Summary Judgment As It Had No Prior Notice Of Any Problem With The Stairs Or Handrail.

It is black-letter law that "a defendant who had no actual or constructive knowledge of the allegedly hazardous condition…cannot be found to have violated its duty of care.  See Barry v. Beverly Enterprises-Massachusetts, Inc., 418 Mass. 590, 594 (1994); Olivier v. Massachusetts Bay Transportation Authy., 363 Mass. 165, 166 (1973); Camerlin v. Marshall, 411 Mass. 394, 397 (1933); Briggs v. Taylor, 397 Mass. 1010 (1996); Roderick v. Brandy Hill Co., 36 Mass.

App. Ct. 948, 949 (1994); Welch v. Angelo's Supermarket, Inc., 27 Mass. App. Ct. 1106 (1989); Ventor v. Mariannne, Inc., 1 Mass. App. Ct. 224, 225 (1973).

The undisputed testimony is that the handrail did not violate the building code as the building at 79 Paris Street is exempted (grandfathered) from the code.  Moreover, there is no evidence that EBNHC was aware of any other falls on the stairwell or any concern with the handrails prior to Mrs. Thibeau fall on September 26, 2002. J. Thibeau Depo. at 67 (**Exh. E**); Taylor Depo. at 64 (**Exh. B**).[4]  There is no evidence that any other patient or visitor of the clinic ever had any problem with the handrail or stairs.  Id.; Buchieri Depo. at 119-120 (**Exh. D**) Indeed, both Mr. and Mrs. Thibeau had used the stairs and stairwell on several occasions over many years without any problem or concern and, in fact, had previously used the stairs and handrail a number of times after having their eyes dilated. J. Thibeau Depo. at 36-37; 42 (**Exh. E**); G. Thibeau Depo. at 9-14 (**Exh. F**).  They, in turn, testified that they had no concern about the stairwell prior to Mrs. Thibeau's fall. J. Thibeau Depo. at 27; 67 (**Exh. E**).  Ms. Thibeau also readily acknowledged her need to look after her own safety and that she had no complaint about the lighting and, despite dilation, could see her feet, the steps, and the handrail as she was walking.  J. Thibeau Depo. at 150 (**Exh. E**).

Given the lack of any prior notice of any alleged hazard or defect, EBNHC cannot be held negligent as a matter of law entitling it to summary judgment.

### VI.    Any Damages Award Against EBNHC As To The Premises Claim Is Capped At $20,000 Under G.L. c. 231, §85K

Pending before the court is EBNHC's motion to amend to file an amended answer on behalf of the EBNHC to add the affirmative defense that any damages against EBNHC as to the

---

[4] Dr. Taylor, a founder and the Medical Director of the EBNHC for the last thirty-five years testified as follows: Q: Doctor, in the last five years are you aware or can you remember any other incidents where someone fell on the stairs at 79 Paris Street. A. No, I can't remember in the last 35 years." Taylor Depo. at 64 (**Exh. B**); see also Buchieri Depo. at 119-120 (**Exh. D**).

premises liability claim are capped at $20,000 under G.L. c. 231, §85K. See Fed, R. Civ. P. 15(a)(Leave to amend must be freely given). G.L. c. 231, §85K unequivocally provides that where a defendant is a charitable organization and an alleged tort is committed in the course of the charitable purpose, any damages are limited to $20,000. See e.g. Rivera v. University of Massachusetts Memorial Healthcare, 2005 Mass. Super LEXIS 472 (Sept. 16 2005); Connors v. Northeast Hospital Corp., 439 Mass. 469 (2003).

The EBNHC is unequivocally a charitable organization with its express mission statement and purpose to provide healthcare to the public whether people have the ability to pay or not. Taylor Aff. (**Exh. A**) and Exhibit 1 to the affidavit. Hospitals and healthcare centers have long been recognized as charitable. Connors v. Northeast Hospital Corp., 439 Mass 469, 474 (2003); Rivera v. University Mass. Memorial Healthcare, 2005 Mass. Super LEXIS 411 (Sept. 16, 2005); English v. New England Medical Center, 405 Mass. 423 (1989); Harlow v. Chin, 405 Mass. 423 (1989); Goldberg v. Northeastern University, 60 Mass. App. Ct. 707 (2004); Simpson v. Truesdale Hospital Inc., 338 Mass. 787 (1958); Roosen v. Peter Bent Brigham Hosp., 235 Mass. 66 (1920).

The deposition and affidavit of Dr. James Taylor, the Medical Director and a founder of the EBNHC for the last 35 years, makes clear EBNHC's long-time charitable status. See (**Exh. A**).[5] Indeed, the express mission statement of the EBNHC is "to provide easily accessible, affordable, appropriate, high quality, personalized, coordinated primary care for all who live and work in East Boston and the surrounding communities without regard to age, income, insurance status, language, cultural or social circumstances." Taylor Aff. (Exhibit 1 to **Exh. A**).

---

[5]  EBNHC acknowledges that the charitable cap under G.L.c. 231, §85K does not apply to the professional negligence claims asserted by plaintiff and which are being defended by the government in this action.

Not only is EBNHC a charitable organization under G.L.c. 231, 85K, but since Mrs. Thibeau's alleged injury occurred while at the premises for eye care, the alleged tort occurred in the course of EBNHC's charitable purpose (i.e. healthcare). Given the clear applicability of G.L. c. 231, §85K, EBNHC submits it is entitled to a ruling that any damage award is limited to $20,000 as to the non-professional negligence claim (i.e. handrail) or, in the alternative, the right to submit further memorandum after the ruling on EBNHC's motion to amend its answers to add the statutory limit under G.L. c. 231, §85K as an affirmative defense.

## CONCLUSION

WHEREFORE, EBNHC respectfully requests that Summary Judgment enter on so much of plaintiffs' Complaint alleging any premise liability claim or, in the alternative, issue a ruling that any damages be capped at $20,000 pursuant to G.L. c. 231, §85K.

The Defendant
East Boston Neighborhood Health Center
By its attorneys,

*/s/ Tory A. Weigand*

Tory A. Weigand, BBO #548553
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210
Tel: 617-439-7500
Direct Fax: 617-342-4947

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2005, a true copy of the above document was served upon each counsel of record electronically through filing with the ECF system.

*/s/ Tory A. Weigand*

Tory A. Weigand

19