UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 DEC -5  P 4: 00

US DISTRICT COURT
DISTRICT OF MASS.

JUDITH THIBEAU
and GEORGE THIBEAU,
                    Plaintiffs,

v.

UNITED STATES OF AMERICA
and EAST BOSTON NEIGHBORHOOD
HEALTH CENTER CORPORATION
                    Defendants.

Docket No. 04-10643MLW

## **PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS**

Plaintiffs hereby state their disagreement with the following facts cited by defendant as undisputed in support of its motion for summary judgment, according to the paragraph number set forth in defendant's motion:

17.    Ms. Thibeau's appointment on September 26, 2002 was for an examination and consultation with an eye surgeon in preparation for cataract surgery.

18.    The appointment in question was on September 26, 2002, not September 16.

24.    Page 27 of Ms. Thibeau's deposition does not contain this testimony.

32.    Ms. Thibeau testified that she was looking where she was walking, but could not recall if she was looking down at every step or looking down at where she was placing her feet.

33.    Ms. Thibeau agreed that if she was to look to the left where she had her hand on the handrail she was able to see the hand rail, not that she had "no problems seeing the

handrail." Further, Ms. Thibeau's testimony was that she agreed that if she was to look down at her feet that she could have seen her feet, and that if she were to look at the steps she could have seen the steps, and that if she were to have to looked to the left where her hand was on the handrail that she could have been able to see the handrail.

39. Ms. Thibeau testified that she had not seen the elevator at any of the times she had been to the clinic, that she was not aware of the elevator being present, that she did not know if the elevator was functioning on the day of her accident and that she did not know the elevator was there.

44. Ms. Thibeau testified that she "never really thought about" needing to watch for her own safety.

45. The statement and description of what photographs show is too vague and inexact that it does not establish the fact of the exact location of the elevator. Furthermore, photographs do not confirm that the elevator can been seen at the first floor stairway.

46. Defendants state that Eisenberg's report speaks for itself, and should be read in its entirety when considered with defendant's motion for summary judgment.

## PLAINTIFFS' STATEMENT OF ADDITIONAL UNDISPUTED FACTS

In support of their opposition to defendant's motion for summary judgment plaintiffs set forth the following undisputed facts:

1. Ms. Thibeau fell at the bottom of the stairs at 79 Paris Street when she missed the last step. Exhibit "A", Deposition of Judith Thibeau, p. 62.

2.  Ms. Thibeau missed the last step because her eyes were blurry and she thought she was at the bottom of the stairs because the handrail had ended. Id. pp. 63, 77.

3.  Dr. John Pietrantonio is the director of the eye clinic of the East Boston Neighborhood Health Center, and has held that position since 1981. Exhibit "B", Deposition of John Pietrantonio, pp. 10-11.

4.  Dr. Pietrantonio is an optometrist. Id. p. 8.

5.  Dr. Pietrantonio is an employee of the Health Center. Id. p. 145.

6.  Dr. Pietrantonio is aware that eye dilation causes a visual impairment, and that once the Health Center's eye clinic's patients have had their eyes dilated that the clinic owes them a duty to make sure that the patients to make it safely out of the building. Id. pp. 123-124.

7.  Dr. James O. Taylor is the chief medical officer of the Health Center. Exhibit "C", Deposition of Dr. Taylor, p. 6.

8.  The Health Center has operated an eye clinic on the second floor of the building at 79 Paris Street for more than 20 years. Id. p. 23.

9.  Since at least 1978 there have been no changes to the stairs or handrails on the stairs running from the first to second floors in the building at 79 Paris Street. Id. pp. 7, 82-83.

10. Dennis Buchieri is the facilities director of the Health Center and as such is responsible for maintenance construction and safety at the building at 79 Paris Street. Exhibit "D", Deposition of Dennis Buchieri, pp. 7, 19.

11. Mr. Buchieri was aware that there is an eye clinic on the second floor of the building at 79 Paris Street. Id. p. 52.

12.  Mr. Buchieri has had specialized training with regard to making buildings handicapped accessible. Id. p. 43.

13.  Buchieri has substantial experience with handrails, having installed them in a number of buildings owned or maintained by the Health Center. Id. pp. 100-106.

14.  Buchieri is aware that the law sometime requires handrails to extend beyond the bottom of stairs, and that these extensions can be safety improvements. Id. pp. 107-108.

15.  Buchieri is aware that an extended stair railing may improve the safety of stairs and stair railings.

16.  Buchieri is aware that extending the stair railings at the bottom of the stairs at 79 Paris Street might improve the safety of those railings. Id. pp. 110-111, 115-116.

Plaintiffs,
Judith and George Thibeau,
by their attorney,

James L. Frederick, Esq.
BBO #543597
Koufman & Frederick,LLP
1330 Beacon Street, Suite 311
Brookline, MA 02446-3202
(617) 738-7880

# EXHIBIT A



VOLUME  I
PAGES: 1-156
EXHIBITS: 7

UNITED STATES DISTRICT COURT
for the
EASTERN DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JUDITH THIBEAU, and GEORGE THIBEAU,<br><br>        Plaintiffs<br><br>vs.<br><br><br>UNITED STATES OF AMERICA and EAST BOSTON NEIGHBORHOOD HEALTH CENTER CORPORATION,<br><br>        Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) C.A. NO.<br>) 04-10643 LTS<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEPOSITION OF JUDITH THIBEAU,** a witness called on behalf of the Defendant, East Boston Neighborhood Health Center, pursuant to the Massachusetts Rules of Civil Procedure, before Karrie Smith, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at Koufman & Frederick, LLP, 1330 Beacon Street, Brookline, Massachusetts, on Tuesday, June 28, 2005, commencing at 10:17 a.m.

EPPLEY COURT REPORTING, LLC
Post Office Box 382
Hopedale, Massachusetts 01747
(508) 478-9795  (508) 478-0595 (Fax)
leppley@msn.com

1          Q.   Why don't you tell me what happened as

2     you went down the stairwell?

3          A.   I thought I was at the bottom of the

4     stairs and I missed the last step.

5          Q.   When you say you missed the last step,

6     what do you mean?

7          A.   Well, I stepped over it.  I believe I

8     missed that step and that's when I fell.  I went

9     forward.

10         Q.   When you missed the step, which foot do

11    you recall stepping with, your left or your right?

12         A.   I don't recall.

13         Q.   Now, you broke the left ankle; is that

14    correct?

15         A.   Yes.

16         Q.   Do you know what your left ankle hit to

17    cause the break?

18         A.   What I think?

19         Q.   Yes, your best memory.

20         A.   The step, the end of the step.

21         Q.   When you say the end of the step, the

22    last step?

23         A.   I believe it was the second step.

24         Q.   The second step?

```
 1          A.    I don't know.
 2          Q.    When you say you missed the step, did you
 3   miss the last step with your right or your left foot?
 4          A.    Well, I always -- when I walk down the
 5   stairs, I use my right foot going forward, so...
 6          Q.    Do you have a memory -- What you need to
 7   do is let me know if you don't have a memory.  If you
 8   do, that's fine.
 9                As you're going down the step, you have a
10   memory of missing the last step; is that right?
11          A.    Yes.
12          Q.    When you say you missed it, do you have a
13   memory of which foot you were stepping with that
14   missed the step?
15          A.    No, I don't.
16          Q.    Do you know why you missed the step?
17          A.    I thought I was at the bottom.
18          Q.    Why did you think you were at the bottom?
19          A.    Because the railing ended.
20          Q.    So when you say the railing ended, what
21   do you mean?
22          A.    I thought I was at the bottom.
23          Q.    Your hand was on the railing?
24          A.    Yes.  Then I let go because I thought I
```

```
 1            Q.   But what a good indicator is, is about
 2    where the second spindle or iron spindle from the end
 3    is is about where you took your hand off; is that
 4    right?                                             .
 5            A.   Yes.   Yes.
 6            MR. ALBERTO:   Can you identify the
 7    photograph, the exhibit number?
 8            MR. WEIGAND:   Sure.   It is Exhibit 2.
 9            MR. ALBERTO:   Okay.
10            Q.   Have you ever fallen before where you've
11    injured yourself?
12            A.   When I was a kid.  I mean, I broke my
13    wrist, but that's it.
14            Q.   I want to talk to you about some of the
15    medical care you received for your injury, but before
16    I do that, do you believe the stairwell or railing
17    was defective in any way --
18            MR. FREDERICK:   Objection.
19            Q.   -- or unsafe in any way?
20            A.   I have no idea.
21            Q.   Do you know why you fell besides missing
22    the last step?
23            A.   Well, like I said, I thought I was at the
24    bottom and my eyes were blurry and I thought -- I
```

# EXHIBIT B

1

# ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MASSACHUSETTS

04-10643MLW

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
JUDITH THIBEAU and GEORGE THIBEAU,     \*
               Plaintiff,     \*
                                         \*

          V     \*
                                         \*

UNITED STATES OF AMERICA and EAST     \*
BOSTON NEIGHBORHOOD HEALTH CENTER     \*
CORPORATION,     \*
               Defendants.     \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Deposition of UNITED STATES OF AMERICA By

JOHN J. PIETRANTONIO, OD, taken on behalf of

the Plaintiffs, pursuant to Notice under the

Federal Rules of Civil Procedure 30(b)(6),

before Janice A. Maggioli, RPR, RMR, CRR, and

Notary Public in and for the Commonwealth of

Massachusetts, at the offices of Koufman &

Frederick, LLP, 1330 Beacon Street, Brookline,

Massachusetts, on March 23, 2005, commencing at

10:00 a.m.

8

```
 1        please?
 2   A.   P-I-E-T-R-A-N-T-O-N-I-O.
 3   Q.   And where do you live?
 4   A.   6 Birch, B-I-R-C-H, Road, Wenham, W-E-N-H-A-M.
 5   Q.   Wenham, is that north or south?
 6   A.   North.
 7                    MR. ALBERTO:   West.
 8   Q.   I get it mixed up with Wrentham.
 9                    MR. ALBERTO:   Mass. Pike, right?
10   A.   It's actually north.
11   Q.   Next to Hamilton?
12   A.   Yes, Beverly/Danvers area.
13   Q.   Let's see.   Where do you work?
14   A.   At the East Boston Neighborhood Health Center.
15   Q.   And what is your position there?
16   A.   I am an optometrist.
17   Q.   What's your date of birth?
18   A.   3/15/55.
19   Q.   And your Social Security number?
20   A.   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.
21   Q.   Have you ever given a deposition before?
22   A.   Yes.
23   Q.   How many times?
24   A.   Once.
```

```
 1          Hospital, I think.
 2    Q.    And did that case go to trial as far as you
 3          know?
 4    A.    I never heard anything after that.
 5    Q.    Have you ever testified in court before?
 6    A.    No.
 7    Q.    Have you, yourself, ever been sued?
 8    A.    No.
 9    Q.    Have you ever brought suit?
10    A.    No.
11    Q.    Have you ever been contacted by an insurance
12          company relative to any claim or claims brought
13          against the health center?
14    A.    No, I don't believe so.
15    Q.    Now, you said a moment ago that you're an
16          optometrist?
17    A.    Uh-huh.
18    Q.    What is your position -- your formal position
19          at the East Boston Neighborhood Health Center?
20    A.    I guess I'm called director of the eye clinic
21          or the vision center.  Some people call it the
22          vision center.  Some people call it the eye
23          clinic.
24    Q.    How long have you been the director there?
```

| | | |
|---|---|---|
| 1 | A. | Since 1981. |
| 2 | Q. | Going back a bit, where did you go to college? |
| 3 | A. | The New England College of Optometry was for |
| 4 | | optometry.  Before that was Merrimack College. |
| 5 | Q. | In? |
| 6 | A. | North Andover. |
| 7 | Q. | Did you get an undergrad degree? |
| 8 | A. | Undergrad at Merrimack, and a degree from New |
| 9 | | England College of Optometry in Boston. |
| 10 | Q. | Was that a doctorate degree? |
| 11 | A. | Yes. |
| 12 | Q. | Was that a four-year program? |
| 13 | A. | Yes. |
| 14 | Q. | And it's New England College of Optometry? |
| 15 | A. | Yes. |
| 16 | Q. | And where is that located? |
| 17 | A. | 424 Beacon Street in Boston. |
| 18 | Q. | Are you -- do you teach there? |
| 19 | A. | I'm like an adjunct faculty. |
| 20 | Q. | How long have you been an adjunct faculty? |
| 21 | A. | Since I started -- well, I started at the |
| 22 | | health center. |
| 23 | Q. | And what are your duties -- I'm sorry. |
| 24 | A. | Since '81, I guess. |

| | |
|---|---|
| 1 | safely out of the building? |
| 2 | A. Yes. |
| 3 | Q. And when I say "the building," I mean the |
| 4 | building where the eye clinic is located at 79 |
| 5 | Paris Street. |
| 6 | A. Yes. |
| 7 | Q. Do you -- with patients that have their eyes |
| 8 | dilated is part of the standard procedure at |
| 9 | the clinic to make sure that they have -- that |
| 10 | the patient whose eyes are dilated leave with |
| 11 | someone? |
| 12 | A. We ask people if they are with somebody.  We |
| 13 | tell them what -- we give them our precautions, |
| 14 | and then they have to make a decision with us |
| 15 | about whether they should be with somebody or |
| 16 | not, but patients come by themselves and have |
| 17 | their eyes examined. |
| 18 | Q. The precautions that you just mentioned, are |
| 19 | those the -- |
| 20 | A. Blurry vision. |
| 21 | Q. -- the standard precautions that are in Exhibit |
| 22 | No. 3 I think it is? |
| 23 | A. 3, yes. |
| 24 | Q. And then you said a moment ago that they have |

```
 1   A.   I think I was a member as a student, so I think

 2        I have had membership since I was a student.

 3   Q.   And so you have been getting their journal for

 4        a number of years, correct?

 5   A.   Yes.

 6   Q.   And when you get the journal, do you read it

 7        through?  You try to?

 8   A.   I thumb through it and I find what articles may

 9        interest me, and I read those.  Do I read every

10        article that comes through every month?  No.

11   Q.   What do you do with the issues once you thumb

12        through them and read the articles?  Do you

13        throw them out or keep them for a while?

14   A.   I keep them for a while.  I may keep them for

15        months or a year or whatever and throw them

16        out.

17   Q.   Doctor, you would agree with me that the

18        process of dilation causes a visual impairment?

19   A.   In most cases.  Yes.  Yes.  It can affect some

20        people's vision.

21   Q.   Would you agree with me that once you have

22        treated a patient and they have a visual

23        impairment say due to dilation, that the clinic

24        has a duty to make sure that they make it
```

| | | |
|---|---|---|
| 1 | | examiners in the clinical trials.  So if they |
| 2 | | have a clinical trial that I'm available in the |
| 3 | | time that I'm available and I want to do it and |
| 4 | | they want me to do it, then we make an |
| 5 | | arrangement for that, so. |
| 6 | Q. | For your work at the eye clinic you are paid by |
| 7 | | check, correct? |
| 8 | A. | Yes. |
| 9 | Q. | And who issues those checks?  What's the name |
| 10 | | on the check? |
| 11 | A. | The East Boston Neighborhood Health Center. |
| 12 | Q. | And has it always been the case? |
| 13 | A. | Yes. |
| 14 | Q. | Going back to dilation and the warnings that |
| 15 | | you give to people, are there -- do the side |
| 16 | | effects for dilation, do they increase or |
| 17 | | change in any way depending on the age of the |
| 18 | | person? |
| 19 | A. | It's hard to say because the -- it depends on |
| 20 | | the person.  It depends on their prescription. |
| 21 | | Farsighted people have a harder time than |
| 22 | | nearsighted people, so there's a spectrum.  On |
| 23 | | average a farsighted person might have a little |
| 24 | | more time -- little more trouble than a |

# EXHIBIT C

1

Volume I
Pages 1-90

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MASSACHUSETTS

C.A. 04-10643 MLW

————————————————————

JUDITH THIBEAU
and GEORGE THIBEAU,
              Plaintiff

vs

UNITED STATES OF AMERICA
and EAST BOSTON NEIGHBORHOOD
HEALTH CENTER CORPORATION,
              Defendant

————————————————————

          DEPOSITION of JAMES O. TAYLOR, M.D.,

     taken on behalf of the Plaintiff, pursuant

     to the Federal Rules of Civil Procedure,

     before Norma J. Black, CSR #108593, and

     Notary Public in and for the Commonwealth

     of Massachusetts, at the Law Offices of

     Frederick & Associates, 1330 Beacon Street,

     Brookline, Massachusetts 02446-3202,

     commencing at 10:30 a.m., on Monday, March

     21, 2005.

ALL-WRITE TRANSCRIPTION & REPORTING SERVICES
          955 WASHINGTON STREET
               NORWOOD
          MASSACHUSETTS   02062
             (781)769-3172

6

| | | |
|---|---|---|
| 1 | A | For thirty-five years. |
| 2 | Q | What is your position at East Boston |
| 3 | | Neighborhood Health Center? |
| 4 | A | Chief Medical Officer. |
| 5 | Q | How long have you been the Chief Medical |
| 6 | | Officer there? |
| 7 | A | I guess my title was Medical Director |
| 8 | | starting in about 1971, and maybe ten years |
| 9 | | ago it was changed. |
| 10 | Q | Briefly, please tell me your educational |
| 11 | | background? |
| 12 | A | I did my undergraduate training at |
| 13 | | Occidental College in Los Angeles.  I went |
| 14 | | to UCLA Medical School and graduated in |
| 15 | | 1963.  I then came to the Boston City |
| 16 | | Hospital where I was an intern and first |
| 17 | | year resident in 1963 through 1965. |
| 18 | | I joined the United States |
| 19 | | Public Health Service and was stationed in |
| 20 | | Duki, East Pakistan, which is now |
| 21 | | Bangladesh, for three years and returned to |
| 22 | | Boston City Hospital and did a senior |
| 23 | | residency and fellowship in infectious |
| 24 | | diseases in 1968 and 1969. |

```
 1                        In 1970, while still a research

 2            fellow, I went to East Boston to begin

 3            hypertension research and was recruited to

 4            help start a health center.

 5      Q     So did you, in fact, help start the East

 6            Boston Neighborhood Health Center?

 7      A     Yes.

 8      Q     You were there at the beginning then?

 9      A     Yes.

10      Q     Do you have a specialty, Doctor?

11      A     Internal medicine.

12      Q     Are you board certified?

13      A     I'm board eligible, not board certified.

14      Q     With regards to being the Chief Medical

15            Officer, can you tell me what the duties of

16            that job are?

17      A     I am really responsible for the medical

18            care provided.  I recruit and supervise the

19            medical staff.  We now have over a 140

20            different physicians employed by the health

21            center.  The total health center staff is

22            about 750 people.

23      Q     The total staff?

24      A     Yes.  We see about 230,000 patient visits a
```

23

1              And in the basement there's

2         some storage.  I think there may be some

3         facilities, workshop.  I think that's it.

4    Q    So it's three floors above ground?

5    A    Three above ground, yes.

6    Q    And the third floor, do any patients go up

7         to the third floor?

8    A    Not as part of routine medical care, no.

9    Q    So in that building, the routine medical

10        care is only given on the second floor?

11   A    Second and first, yes.

12   Q    And with the dental clinic on the second

13        floor, how do you enter the dental clinic?

14   A    By the stairs or elevator -- share a common

15        door on the second floor after the landing.

16   Q    Was this the setup in 2002?

17   A    Yes.

18   Q    How long has the eye clinic been on the

19        second floor there?

20   A    Guessing again, I would say twenty years or

21        more.  I'm not sure.

22   Q    Is the money to operate the eye clinic

23        separately budgeted?

24   A    No.

1           contract too?

2     A    No.   The students would fall under the

3           agreement we have with New England College

4           of Optometry.

5                   MR. ALBERTO:  So you're not

6           sure if it's a contract or a letter?

7     A    I think it's probably a letter of

8           understanding, a memo of understanding.

9           It's not a contract.

10                  MR. ALBERTO:  Does he sign it?

11    A    I don't know whether he would then or not.

12                  Currently, basically what

13          happens, the medical staff office will send

14          out a letter of understanding with my

15          signature on it and ask for their signature

16          back.  But he's been there so long, I don't

17          know what the mechanism by which that

18          original arrangement was made.  But again,

19          we have a medical staff office and all his

20          files would be kept there.

21    Q    Doctor, during the entire time you have

22          worked at the clinic, to your memory have

23          there been any changes to the stairway from

24          the second floor to the first floor at 79

83

1          Paris Street?

2     A    No, I don't believe there has been at all.

3     Q    That also includes the banisters and the

4          railings?

5     A    I don't believe so.  I think they look like

6          the originals.

7     Q    Doctor, what is your home address?

8     A    211 Cliff Avenue, Winthrop, Massachusetts.

9     Q    Suffolk County?

10    A    Yes.

11    Q    Do you meet with Dennis Buchieri on a

12         regular basis?

13    A    We don't have a regularly scheduled

14         meeting.  We meet together around issues

15         all the time.  His really direct line of

16         report is to John Cradock, the CEO.  But

17         we're talking five or six times a week.

18         There's not a formal meeting structure that

19         I would sit with him on a regular basis.

20    Q    Doctor, a few minutes ago you said that you

21         felt responsible for the safety of the

22         patients once they come into the clinic

23         when they are on the premises?

24    A    Yes.  I feel it is part of my job to worry

# EXHIBIT D

Volume:     1
Pages:    123
Exhibits:    10

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO.: 04-10643 MLW

* * * * * * * * * * * * * * * * * *
                                   *
JUDITH THIBEAU and                 *
  GEORGE THIBEAU,                  *
                Plaintiffs         *
                                   *
vs.                                *
                                   *
UNITED STATES OF AMERICA           *
  and EAST BOSTON NEIGHBORHOOD     *
  HEALTH CENTER CORPORATION,       *
                Defendants         *
                                   *
* * * * * * * * * * * * * * * * * *

        DEPOSITION of DENNIS BUCHIERI, a witness called on
behalf of the Plaintiffs, taken pursuant to the
Massachusetts Rules of Civil Procedure, before Anne
Ouellette, a Professional Court Reporter and Notary Public
in and for the Commonwealth of Massachusetts, at the Law
Offices of Koufman & Frederick, 1330 Beacon Street,
Suite 311, Brookline, MA  02446, on June 24, 2005,
commencing at 9:39 a.m.


            ALL-WRITE TRANSCRIPTION &
            REPORTING SERVICES, INC
            955 Washington Street
                  Suite 1
          Norwood, Massachusetts 02062
                781-769-3172

1   A.   East Boston Neighborhood Health Center.

2   Q.   How long have you worked there?

3   A.   Eighteen years.

4   Q.   What is your position there?

5   A.   I'm the Facilities Director.

6   Q.   How long have you been the Facilities Director?

7   A.   For 18 years.

8   Q.   Are you paid weekly or biweekly?

9   A.   Biweekly.

10  Q.   Your paychecks, who issues those?

11  A.   What bank issues them?

12  Q.   Well, let me rephrase that, who pays your paycheck?

13  A.   The East Boston Neighborhood Health Center.

14  Q.   Is that on the check itself?

15  A.   I believe so.

16  Q.   Has it always been that way your entire 18 years there?

17  A.   I believe so, yes.

18  Q.   You were asked to come here by the attorney who represents

19       East Boston Neighborhood Health Center; is that correct?

20  A.   Yes.

21  Q.   Were you shown -- before you came here, were you shown a

22       Notice of Deposition for East Boston Neighborhood Health

23       Center?

24  A.   Yes.

1  Q.  If you could, just in general, describe the job that you
2      have at the East Boston Neighborhood Health Center?
3  A.  I am in charge of maintenance, security, housekeeping,
4      transportation, food services, construction, real estate,
5      and a lot of daily operational things that crossover all
6      the lines.  I'm the safety officer, I chair the safety
7      committee, I'm on the performance improvement committee;
8      that's probably a pretty good description of what I do.
9  Q.  How many hours a week do you work?
10 A.  Too many.
11 Q.  Well?
12 A.  It varies, 40 to 50, sometimes more.
13 Q.  Since you've been at the East Boston Neighborhood Health
14     Center, have you gone to any seminars?
15 A.  A few, none for quite a while.
16 Q.  What are the seminars that you can remember going to?
17 A.  To facilities management seminars, seminars on power
18     systems and economics.
19 Q.  Power systems?
20 A.  Power systems, generators, electricity, gas.
21 Q.  Any others that you can remember?
22 A.  Just lots of in house training, things that we do.
23 Q.  Let me back up a second -- The East Boston Neighborhood
24     Health Center; can you describe for me the locations that

1   Q.   What terminology have you heard of it?

2   A.   If it has to do with the AIA standards, the construction

3        standards, I would have knowledge of it, and I don't know

4        what it is you're referring to, so --

5   Q.   Have you had any particular training with regard to making

6        sure that buildings comply with handicapped accessibility?

7   A.   Yes.

8   Q.   What training have you had?

9   A.   I have in the past taken some seminar classes on AIA.

10  Q.   Can you tell me the names of those seminars?

11  A.   I couldn't possibly, unfortunately.

12  Q.   When was the last such class you took?

13  A.   Oh, it's been quite a while, it's probably at least 10

14       years.

15  Q.   With regard to these seminar classes, are these seminar

16       classes that you've taken since you've been working at the

17       East Boston Neighborhood Health Center?

18  A.   Some of them but I've gone to different things over the

19       last 25 years.

20  Q.   Let's limit it to the time you've been at the East Boston

21       Neighborhood Health Center.  Have you had any seminars or

22       classes with regard to handicapped accessibility in

23       buildings?

24  A.   Yes.

52

1     that's it.

2  Q.  What about 79 Paris Street, does it own that building?

3  A.  No.

4  Q.  Who owns that building?

5  A.  George Robert White Fund.

6  Q.  Does the East Boston Neighborhood Health Center maintain

7     that building?

8  A.  Yes.

9  Q.  How else would you describe the relationship --

10           MR. FREDERICK:  Strike that.

11  Q.  Is the East Boston Neighborhood Health Center responsible

12     for repairs of 79 Paris Street?

13  A.  Cosmetic repairs.

14  Q.  You're responsible for maintaining; right?

15  A.  Yes.

16  Q.  Is East Boston Neighborhood Health Center responsible for

17     the safety of persons who visit 79 Paris Street?

18  A.  Yes.

19  Q.  That includes all the patients that come there; correct?

20  A.  Yes.

21  Q.  Your aware that on the second floor of 79 Gove Street there

22     is a dental clinic and an eye clinic?

23  A.  79 Paris Street, yes.

24  Q.  Are there any other clinics at that location?

1  Q.  Sir, I want to show you again your Exhibit No. 5.  Does the
2      stairs and the landing and the handrails look the same
3      today as it does in that photograph?
4  A.  Yes.
5  Q.  It does?
6  A.  Yes.
7  Q.  There have been no changes to the handrail since that day?
8  A.  No changes, no.
9  Q.  If there were any changes to the handrailings who would be
10     responsible for making changes?
11 A.  I would.
12 Q.  You would direct someone to do that if you were inclined to
13     make a change to the handrail?
14 A.  Yes.
15 Q.  Who would you direct to do that?
16 A.  It wouldn't be any of my staff, we don't deal -- you know,
17     we don't work on handrails like that.  That would have to
18     be someone from the outside who is capable of doing that,
19     has the expertise to do it, a contractor of some sort.  I'd
20     also be going through the George Robert White Fund if I did
21     anything like that.
22 Q.  In any of the building that you oversee, have you had to
23     any work on the handrails?
24 A.  Yes.

101

1  Q.  Which buildings?

2  A.  Which buildings?  I had a contractor do work at 26 Sturgis

3      Street and at 10 Gove Street.

4  Q.  Hold on just one second.  Okay, 26 Sturgis.

5  A.  Yes.

6  Q.  What was the other one?

7  A.  10 Gove.

8  Q.  Okay.

9  A.  155 Addison Street, 59 Meridian Street, I think that's it.

10 Q.  So, those are four buildings?

11 A.  Yes.

12 Q.  What's the nature of the work you had done on the

13     handrailings at 10 Gove Street?

14 A.  10 Gove Street, when we put the addition on there were

15     places where we continued handrails that we had on the old

16     side of the building.

17 Q.  When you say continued, what do you mean by that?

18 A.  Handrails where the new building abutted the old building,

19     where we continued handrails in the corridors.

20 Q.  They were not on the stairs, they were in corridors?

21 A.  Not on stairs, no.  None of these were on stairs.

22 Q.  None of the changes to handrails were on the stairs?

23 A.  No.

24 Q.  What about at 59 Meridian Street?

1   A.   It's on a ramp leading into the building.

2   Q.   What was the nature of the change you made there?

3   A.   There were none, we put them in.

4   Q.   Oh, you put them up?

5   A.   When we renovated that building 18 years ago we only had

6        the third floor of it.  There was a fire in the building

7        and we took the second and the first-floor and we did some

8        renovations, put a handicapped ramp, this is inside the

9        building.

10  Q.   Right.

11  A.   We also put a ramp outside the building with a railing.

12  Q.   A handicapped ramp?

13  A.   Yes, it's handicapped codes.  It has an upper and a lower

14       rail -- don't quote me on the height -- but there are

15       specific heights that they have to be and they have to run

16       from specific points to cover the entire ramps, minimum.

17  Q.   Who did that work on the railings?

18  A.   59 Meridian Street was done by R.C. Griffin & Company.

19  Q.   Is that a --

20  A.   A contractor.

21  Q.   Like maybe a --

22  A.   A general contractor.

23  Q.   Okay, R.C. Griffin you say?

24  A.   Yeah.

1   Q.   Where are they located?

2   A.   Peabody.

3   Q.   And at Gove Street, who did the work on the handrailings

4        there?

5   A.   That was the -- my mind just went blank.

6   Q.   I'll come back to it.

7   A.   Thank you, I'll remember it.

8   Q.   Sturgis Street, what was the nature of the changes to

9        handrails there?

10  A.   We built an addition to the building and we installed

11       handrails.

12  Q.   Were those handrails --

13  A.   The Walsh Company did 10 Gove Street.

14  Q.   Where are they located, do you know?

15  A.   South Boston.

16  Q.   Going back to Sturgis Street, what was the work you did

17       with regard to handrails there?

18  A.   We put an addition on the building and we put handrails in

19       it, in places.

20  Q.   Where in particular in that building did you put handrails?

21  A.   In a corridor that has medical services and transitional

22       housing in it.

23  Q.   Is that the only place?

24  A.   In that building, yes.

104

1   Q.   Is that corridor where you put the handrails, is that
2        corridor slanted?
3   A.   No.
4   Q.   Is it a straight-away?
5   A.   Yes.
6   Q.   As far as you know was there some governmental requirement
7        that you put handrails there?
8   A.   No.
9   Q.   There was not?
10  A.   No, it's a safety issue.
11  Q.   Whose decision was it to put handrails there?
12  A.   Mine.
13  Q.   Did anyone advise you to do that?
14  A.   No.
15  Q.   With regard to the handrails that were added at 59
16       Meridian?
17  A.   Yes.
18  Q.   Whose decision was it to place handrails there?
19  A.   Mine.
20  Q.   And did anyone direct you to do that?
21  A.   No.
22  Q.   Did you --
23  A.   Let me take that back.  It was part of the architect's
24       drawings to put them in.  So, it's an architectural design

| | |
|---|---|
| 1 | | so, the architect is the one that did the specifications |
| 2 | | for them. |
| 3 | Q. | Do you know, with regard to 59 Meridian Street, do you know |
| 4 | | whether those handrails were required by any statute or a |
| 5 | | law or a regulation? |
| 6 | A. | Yes. |
| 7 | Q. | They were required? |
| 8 | A. | Yes. |
| 9 | Q. | Which statue or regulation were they required by? |
| 10 | A. | I couldn't tell you the number or name of the statute. |
| 11 | Q. | Were you made aware of that -- |
| 12 | A. | Or statutes. |
| 13 | Q. | -- Were you made aware of that by the architect or how did |
| 14 | | you know that? |
| 15 | A. | It's one those things that you learn over the years doing |
| 16 | | this business.  I don't know if it was 20 years or 40 years |
| 17 | | ago I learned that. |
| 18 | Q. | I'm sorry, what did you learn 20 or 40 years ago? |
| 19 | A. | That you need to have handicapped rails going up a ramp.  I |
| 20 | | couldn't tell you when I learned it. |
| 21 | Q. | With regard to 155 Addison Street, what was the nature of |
| 22 | | the work, providing handrails or installing handrails |
| 23 | | there? |
| 24 | A. | The nature of the reason that we put them in? |

1  Q.  No, what -- It was poorly worded -- Were the handrails

2      installed or added in on 155 Addison Street?

3  A.  They were added.

4  Q.  Where were they added?

5  A.  They were added in a corridor where we had people coming in

6      and out of the building.  There is a ramp there, it's a

7      very slight ramp.  It's an area that you walk through and

8      we put handrails in there; we use that for an adult day

9      care program.  So, it's a safety issue.

10 Q.  Those handrails are on the first-floor of the building?

11 A.  Yes.

12 Q.  You say that's in an entrance way into the building?

13 A.  Yes.

14 Q.  That is on a slight ramp?

15 A.  Yes.

16 Q.  Do you know who installed those handrails?

17 A.  Our maintenance guys installed those handrails.

18 Q.  Who in particular of the maintenance guys?

19 A.  I have no idea.

20 Q.  Was it Mr. Foley?

21 A.  No, well, it could have been, I can't say that it was.

22 Q.  Do you know when those handrails were installed?

23 A.  Ten years ago.

24 Q.  Who decided to install handrails there?

| | | |
|---|---|---|
| 1 | A. | I did. |
| 2 | Q. | For what reason did you decide to install handrails there? |
| 3 | A. | General safety. |
| 4 | Q. | Were you directed by any person to install handrails at |
| 5 | | that building? |
| 6 | A. | No. |
| 7 | Q. | To your knowledge was there any particular statute or |
| 8 | | regulation that required you to put handrails there? |
| 9 | A. | No. |
| 10 | Q. | No, there wasn't or no, you don't know? |
| 11 | A. | No, there wasn't, that I'm aware of. |
| 12 | Q. | Are you aware of any statute or regulation that requires |
| 13 | | handrails on the stairs to extend beyond the bottom of the |
| 14 | | stairs? |
| 15 | A. | I belive so. |
| 16 | Q. | What statute or regulation are you aware of? |
| 17 | A. | I couldn't quote a statute or regulation. |
| 18 | Q. | What's your understanding of what that requirement is? |
| 19 | A. | My understanding that it's now six inches past the stairs |
| 20 | | that you extend the handrail. |
| 21 | Q. | When did you come to know that? |
| 22 | A. | Couldn't tell you. |
| 23 | Q. | Was it more or less than five years ago? |
| 24 | A. | Probably a lot more. |

1  Q.  Is that requirement for all new construction?

2  A.  Yes, I believe so.

3  Q.  What's your understanding of whether that applies to

4      existing buildings?

5  A.  It does not apply to existing, that I'm aware of.

6  Q.  And why is that?

7  A.  I couldn't tell you why it is, I just -- that's what I

8      understand it to be.

9  Q.  You understand that the extension of handrails at the

10     bottom of stairs is a safety issue as well?

11             MR. WEIGAND:  Objection, you can answer.

12 A.  It can actually be a safety issue in both directions.  It

13     can be a hazard.

14 Q.  When you say in both directions, what do you mean?

15 A.  If you have a handrail that sticks out six inches into a

16     walkway at the bottom of the stairs, it could be a hazard.

17 Q.  But can it also be a safety improvement?

18 A.  Yes.

19 Q.  You've been aware of that for at least five or six -- well,

20     more than five years -- that it's a safety aid, if you

21     will?

22 A.  Yes, it's possible to be.

23 Q.  So, you are aware that even though it may not be required

24     on an existing stair, that having an extended stair railing

1       they all walk down the stairs on the left.

2  Q.   Are you aware that one of the reasons for the requirement

3       of having an extended stair rail at the bottom of a set of

4       stairs is to serve as a visual signal for people coming

5       down the stairs that the bottom of the stairs are where the

6       extension is; are you aware of that?

7  A.   I am not.

8            MR. WEIGAND:  Just pause for a second so I can

9       get on the record.  Just make my objection to the form of

10      the question.

11           MR. FREDERICK:  Okay.

12 Q.   So, it's your testimony that at 79 Paris Street, to extend

13      the stair railing six to twelve inches, say six inches, out

14      at the bottom of the stairs, the very bottom, past the

15      bottom step, extending the stair railing up on the right-

16      hand side, by the wall, that that would not improve the

17      safety of the stair railing there?

18           MR. WEIGAND:  Objection, you can answer that.

19 A.   Not necessarily.

20 Q.   But it might?

21 A.   It's possible.

22 Q.   Is it your testimony that extending the stair railing out

23      on the left-hand side, as you're coming down those set of

24      stairs, extending it out at the bottom of the stairs, at

1    the landing, extending it out say six inches, is it your

2    testimony that that would not improve the safety of that

3    railing on that side?

4              MR. WEIGAND:  Objection, you may answer.

5              MR. FREDERICK:  You can answer that one.

6    A.   It may or it may not.

7    Q.   Sir, in the Facilities Policies and Procedures manual that

8         you've provided, there are some pages from  something

9         called Kineteck or Kinetics.

10   A.   Kinetics.

11   Q.   What is that?

12   A.   They inspect electrical medical equipment, anything that

13        plugs into power.  They inspect it, they do some service on

14        it.

15   Q.   Is that an independent contractor?

16   A.   Yes.

17   Q.   Does East Boston Neighborhood Health Center have a contract

18        with Kinetics?

19   A.   Yes.

20   Q.   Would you agree with that it's important for East Boston

21        Neighborhood Health Center to make the insides of it's

22        buildings as safe as possible for the patients that it

23        serves?

24   A.   Yes.

1   Q.   Do you know what his position is with the mayor's office?

2   A.   I don't.

3   Q.   How long have you been dealing with him, how many years?

4   A.   Eighteen, I believe.

5   Q.   Have you ever in your 18 years there have you ever had get

6        a building permit from the City of Boston to do any work at

7        79 Paris Street?

8   A.   No.

9   Q.   Do you know if one was ever issued during that time?

10  A.   Yes.  I assume that when they did the work that they did in

11       '89, 90 or around that time, that they had a building

12       permit to do that work.

13  Q.   But you just don't have a memory of actually seeing it; is

14       that correct?

15  A.   I may not have ever seen it and I might have a copy in my

16       office.  I'm not sure.

17  Q.   So, it's a possibility that you have a copy of that?

18  A.   It's possible.

19  Q.   With regard to those questions I asked you a few minutes

20       ago about a possible extension of the handrail at the

21       bottom of the stairs at 79 Paris Street, I asked you

22       whether extending it six inches would make the handrails

23       and the stairs more safe, and you said, yes.  You said

24       maybe -- I can't remember what you said.

116

1  A.  It could, it might or might not.

2  Q.  Does the same go for if it was extended, say 12 inches?

3  A.  I couldn't answer that.  I don't know.

4  Q.  Why is that?

5  A.  Why do I not know?

6  Q.  Yes.

7  A.  I don't know the regs that well.  Do I think that it would

8      be safer, it might, it might not.  You're now lower.  Every

9      time you extend it, it's down lower than the stairs which

10     creates another problem.  So, if you go out a foot you're

11     now way lower than you should be so --

12 Q.  No, I mean foot, horizontally, not a foot down.

13 A.  Well, the rails on the stairs go down.  So, you're saying

14     rather than --

15 Q.  I'm sorry, let me rephrase my question, it's confusing.  If

16     you extended the handrail at 79 Paris Street, on say the

17     right-hand side, going down to the first-floor, if you

18     extended it all the way down to the actual landing where

19     the first-floor is and then out 12 inches, would that make

20     the stairs and the handrail safer for the people who are

21     using the stairs?

22 A.  I can't answer that question.

23 Q.  Why?

24 A.  It may, it may not.  I wouldn't do it if you had a

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that a copy of the foregoing pleading was served upon the following attorney(s) VIA FIRST CLASS MAIL:

Christopher Alberto, Esq.
Assistant U.S. Attorney
United States Attorney for The District of Massachusetts
U.S. Courthouse, Suite 9200
1 Courthouse Way
Boston, MA 02210

Tory A. Weigand, Esq.
Morrison Mahoney, LLP
250 Summer Street
Boston, MA 02210

DATED: 12/6, 2005

James L. Frederick, Esq.
BBO #543597
Koufman & Frederick, LLP
1330 Beacon Street, Suite 311
Brookline, MA 02446
(617) 738-7880