FILED
UNITED STATES DISTRICT COURT CLERKS OFFICE
FOR THE EASTERN DISTRICT OF MASSACHUSETTS

2005 DEC 28  P 2: 30

U.S. DISTRICT COURT
DISTRICT OF MASS

JUDITH THIBEAU

Docket No: 04-10643MLW

and GEORGE THIBEAU,
       Plaintiffs,

v.

UNITED STATES OF AMERICA
and EAST BOSTON NEIGHBORHOOD
HEALTH CENTER CORPORATION
       Defendants.

## PLAINTIFFS' SUPPLEMENTAL STATEMENT OF ADDITIONAL FACTS IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

In further support of their opposition to defendant's motion for summary judgment and in response to issues raised in defendant's Reply Memorandum In Support of Motion for Summary Judgment, plaintiffs set forth the following facts:

1.     Dennis Buchieri either does not know or does not remember whether, during the 18 years he has worked as facilities director at the East Boston Neighborhood Health Center any employee or patient or visitor has fallen on the stairs in the building located at 79 Paris Street. Exhibit "A", transcript of deposition of Dennis Buchieri pp. 117-118.

2.     There are buildings maintained by the Health Center where the Health Center has installed handrails where such handrails were not required by statute or regulation. Id., pp. 105-107.

3.   In particular, the Health Center added handrails to a ramp in the building located at 155
     Addison Street. Id. pp. 105-106.

4.   With regard to the handrails that were added to the ramp at 155 Addison Street, those
     handrails were not required by any statute or regulation. Id. p. 107.

5.   With regard to the handrails that were added to the ramp at 155 Addison Street, the
     Health Center installed the handrails for "General safety." Id.

6.   Dennis Buchieri acknowledged that extension of handrails at the bottom of stairs could
     be a safety improvement. Id. p. 108.

7.   Dennis Buchieri acknowledged that having an extended stair railing may improve the
     safety of the particular stair railing; and that such extension can in some cases improve
     the safety of the stair railing. Id. pp. 108-109.

8.   Dennis Buchieri believes that it is important for the Health Center to make the insides
     of its buildings as safe as possible for the patients it serves. Id. p. 111.

9.   The supplement to the report of plaintiffs' expert Herbert Eisenberg further confirms
     Eisenberg's previously stated opinion that the lack of handrail extensions constitutes a
     dangerous condition for visually impaired persons such as Ms. Thibeau. Exhibit "B",
     Supplement to Plaintiffs' Expert Disclosure.

10.  Eisenberg's supplement to his original report reiterates his opinion that the handrails
     should be extended as to warn visually impaired persons that the stairway is ending and
     to make the stairs reasonably safe for such persons. Id.

11.  Eisenberg's supplement clarifies that lack of handrail extensions on both sides of the
     stairway constitute dangerous conditions. Id.

-2-

12.    Eisenberg's supplement responds to the opinions of defendant's experts by confirming

that an extension of the handrail on the open side of the stairs is feasible.

13.    Plaintiffs' second expert witness, Dr. Arthur Epstein, is expected to testify that dilating

eye drops usually cause loss of contrast sensitivity, decreased depth perception, blurry

vision, glare, sensitivity to light and disorientation. It is also expected that he would

testify that on the date of the accident Ms. Thibeau was suffering from a unilateral

dense cataract. The presence of this condition can reduce contrast sensitivity and

interfere with depth perception. The dilation of her eyes on 9/26/02 likely caused

additional loss of contrast sensitivity, decreased depth perception, blurry vision, glare,

sensitivity to light and disorientation. In combination, the effects of the cataract and

dilation caused Ms. Thibeau to suffer a greater increase in loss of contrast sensitivity,

loss of depth perception and disorientation than would be expected from the standard

effects of dilation. Exhibit "C" Report of Dr. Arthur Epstein.

Plaintiffs,
Judith and George Thibeau,
by their attorney,

James L. Frederick, Esq.
BBO #543597
Koufman & Frederick,LLP
1330 Beacon Street, Suite 311
Brookline, MA 02446-3202
(617) 738-7880

- 3 -

# EXHIBIT A

Volume:       1
Pages:      123
Exhibits:    10

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO.: 04-10643 MLW

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                         \*
JUDITH THIBEAU and                       \*
  GEORGE THIBEAU,                         \*
                    Plaintiffs           \*
                                         \*
vs.                                      \*
                                         \*
UNITED STATES OF AMERICA                 \*
  and EAST BOSTON NEIGHBORHOOD           \*
  HEALTH CENTER CORPORATION,             \*
                    Defendants           \*
                                         \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

        DEPOSITION of DENNIS BUCHIERI, a witness called on
behalf of the Plaintiffs, taken pursuant to the
Massachusetts Rules of Civil Procedure, before Anne
Ouellette, a Professional Court Reporter and Notary Public
in and for the Commonwealth of Massachusetts, at the Law
Offices of Koufman & Frederick, 1330 Beacon Street,
Suite 311, Brookline, MA  02446, on June 24, 2005,
commencing at 9:39 a.m.

                ALL-WRITE TRANSCRIPTION &
                REPORTING SERVICES, INC
                 955 Washington Street
                        Suite 1
              Norwood, Massachusetts 02062
                     781-769-3172

1    so, the architect is the one that did the specifications

2    for them.

3  Q.  Do you know, with regard to 59 Meridian Street, do you know

4    whether those handrails were required by any statute or a

5    law or a regulation?

6  A.  Yes.

7  Q.  They were required?

8  A.  Yes.

9  Q.  Which statue or regulation were they required by?

10  A.  I couldn't tell you the number or name of the statute.

11  Q.  Were you made aware of that --

12  A.  Or statutes.

13  Q.  -- Were you made aware of that by the architect or how did

14    you know that?

15  A.  It's one those things that you learn over the years doing

16    this business.  I don't know if it was 20 years or 40 years

17    ago I learned that.

18  Q.  I'm sorry, what did you learn 20 or 40 years ago?

19  A.  That you need to have handicapped rails going up a ramp.  I

20    couldn't tell you when I learned it.

21  Q.  With regard to 155 Addison Street, what was the nature of

22    the work, providing handrails or installing handrails

23    there?

24  A.  The nature of the reason that we put them in?

1    Q.   No, what -- It was poorly worded -- Were the handrails

2         installed or added in on 155 Addison Street?

3    A.   They were added.

4    Q.   Where were they added?

5    A.   They were added in a corridor where we had people coming in

6         and out of the building.  There is a ramp there, it's a

7         very slight ramp.  It's an area that you walk through and

8         we put handrails in there; we use that for an adult day

9         care program.  So, it's a safety issue.

10   Q.   Those handrails are on the first-floor of the building?

11   A.   Yes.

12   Q.   You say that's in an entrance way into the building?

13   A.   Yes.

14   Q.   That is on a slight ramp?

15   A.   Yes.

16   Q.   Do you know who installed those handrails?

17   A.   Our maintenance guys installed those handrails.

18   Q.   Who in particular of the maintenance guys?

19   A.   I have no idea.

20   Q.   Was it Mr. Foley?

21   A.   No, well, it could have been, I can't say that it was.

22   Q.   Do you know when those handrails were installed?

23   A.   Ten years ago.

24   Q.   Who decided to install handrails there?

| 1 | A. | I did. |
| 2 | Q. | For what reason did you decide to install handrails there? |
| 3 | A. | General safety. |
| 4 | Q. | Were you directed by any person to install handrails at |
| 5 | | that building? |
| 6 | A. | No. |
| 7 | Q. | To your knowledge was there any particular statute or |
| 8 | | regulation that required you to put handrails there? |
| 9 | A. | No. |
| 10 | Q. | No, there wasn't or no, you don't know? |
| 11 | A. | No, there wasn't, that I'm aware of. |
| 12 | Q. | Are you aware of any statute or regulation that requires |
| 13 | | handrails on the stairs to extend beyond the bottom of the |
| 14 | | stairs? |
| 15 | A. | I belive so. |
| 16 | Q. | What statute or regulation are you aware of? |
| 17 | A. | I couldn't quote a statute or regulation. |
| 18 | Q. | What's your understanding of what that requirement is? |
| 19 | A. | My understanding that it's now six inches past the stairs |
| 20 | | that you extend the handrail. |
| 21 | Q. | When did you come to know that? |
| 22 | A. | Couldn't tell you. |
| 23 | Q. | Was it more or less than five years ago? |
| 24 | A. | Probably a lot more. |

1  Q.  Is that requirement for all new construction?

2  A.  Yes, I believe so.

3  Q.  What's your understanding of whether that applies to

4      existing buildings?

5  A.  It does not apply to existing, that I'm aware of.

6  Q.  And why is that?

7  A.  I couldn't tell you why it is, I just -- that's what I

8      understand it to be.

9  Q.  You understand that the extension of handrails at the

10     bottom of stairs is a safety issue as well?

11             MR. WEIGAND:  Objection, you can answer.

12  A.  It can actually be a safety issue in both directions.  It

13     can be a hazard.

14  Q.  When you say in both directions, what do you mean?

15  A.  If you have a handrail that sticks out six inches into a

16     walkway at the bottom of the stairs, it could be a hazard.

17  Q.  But can it also be a safety improvement?

18  A.  Yes.

19  Q.  You've been aware of that for at least five or six -- well,

20     more than five years -- that it's a safety aid, if you

21     will?

22  A.  Yes, it's possible to be.

23  Q.  So, you are aware that even though it may not be required

24     on an existing stair, that having an extended stair railing

1        would improve the safety of that particular stair railing.

2                    MR. WEIGAND:  Objection.

3    A.   I don't agree to that.  It may or it may not.

4    Q.   As you said before, it may not, in that it may stick out

5         and be a hindrance; correct?

6    A.   That's one issue that you could have with it.

7    Q.   But it can improve the safety as well; correct?

8    A.   It can in some cases.

9    Q.   Which cases?

10   A.   You'd have to show me a diagram and I would have an

11        architect look at it to answer that.

12   Q.   Well, say with regard to the stairs at 79 Paris Street, at

13        the bottom of those stairs, do you think -- would extending

14        the stair railings out at the bottom of the stairs on the

15        first-floor improve the safety of those stairs?

16                   MR. WEIGAND:  Objection, you may answer.

17   A.   I wouldn't think that it would make much of a difference at

18        all on those stairs.

19   Q.   Why is that?

20   A.   Because that's a fantastic set of stairs.  You just can't

21        build it much better and having the railings extend -- the

22        one that's in the walk area would be a problem and the one

23        against the wall, where this is such a wide set of stairs,

24        people don't use anyway.  They walk towards the exit so,

1         the landing, extending it out say six inches, is it your

2         testimony that that would not improve the safety of that

3         railing on that side?

4                    MR. WEIGAND:  Objection, you may answer.

5                    MR. FREDERICK:  You can answer that one.

6    A.   It may or it may not.

7    Q.   Sir, in the Facilities Policies and Procedures manual that

8         you've provided, there are some pages from  something

9         called Kineteck or Kinetics.

10   A.   Kinetics.

11   Q.   What is that?

12   A.   They inspect electrical medical equipment, anything that

13        plugs into power.  They inspect it, they do some service on

14        it.

15   Q.   Is that an independent contractor?

16   A.   Yes.

17   Q.   Does East Boston Neighborhood Health Center have a contract

18        with Kinetics?

19   A.   Yes.

20   Q.   Would you agree with that it's important for East Boston

21        Neighborhood Health Center to make the insides of it's

22        buildings as safe as possible for the patients that it

23        serves?

24   A.   Yes.

1    perfectly good set of stairs. If you're putting in a new

2    set of stairs and that's what you need to do to meet the

3    code, that's what you do, you meet the code.

4  Q.  Okay.

5  A.  Is it safer, your guess is as good as mine.

6  Q.  I take it the same holds true for the left-hand side?

7  A.  No, the left-hand side is different, that's the traffic

8    area.  That could actually create a hazard.

9  Q.  But again, could it --

10  A.  This is my opinion.

11  Q.  Yes.

12  A.  You know, I'm not quoting the law here, this is what I

13    think from what I see.

14  Q.  During the 18 years that you have worked there, do you

15    know, one way or the other -- I may have asked you this and

16    I apologize if I did -- but do you know whether there have

17    been any other situations where any person, either an

18    employee or a patient or a visitor, has fallen on the

19    stairs at 79 Paris Street, the inside stairs?

20  A.  No, I don't know of any specific incidences.

21  Q.  Is it that you don't know or you can't remember?

22                 MR. WEIGAND:  Objection.

23  A.  Same thing to me.

24  Q.  If that had happened, if someone fell there, and it was

```
 1         reported to security you might not have a record of such an
 2         accident in your files; correct?
 3    A.   If it was more than two and a quarter years ago I wouldn't
 4         have kept copies of the incidence reports unless there was
 5         an accident that I wrote up a file on.
 6    Q.   And that only happens when --
 7               MR. FREDERICK:  Strike that.
 8    Q.   When do you write up a file on an accident?
 9    A.   When I have something like this incident.
10    Q.   But if again, it's more than two and a half years ago and
11         that had happened, you probably don't have it in your
12         files?
13    A.   If I had an incidence that I wrote up a file on, I still
14         have it.  If it was on an incident report from Security,
15         three, four, five years ago, that somebody slipped and fell
16         and there was nothing more to it than that, then I wouldn't
17         have it.
18    Q.   If there was an accident reported from someone from --
19         filled out by the East Boston Neighborhood Health Center,
20         would you have kept that as well?
21    A.   If there was an accident report then we would have it at
22         the health center.  We review all those accidents that
23         happen, categorize them as slips and falls, try to
24         determine what happened, why they happened, is there
```

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MASSACHUSETTS

JUDITH THIBEAU                                    Docket No. 04-10643MLW  _LTS_
and GEORGE THIBEAU,
                    Plaintiffs,

v.

UNITED STATES OF AMERICA
and EAST BOSTON NEIGHBORHOOD
HEALTH CENTER CORPORATION
                    Defendants.


## SUPPLEMENT TO PLAINTIFFS' EXPERT DISCLOSURE


In supplement to previous expert disclosure, plaintiffs attach hereto supplement to report

of Herbert Eisenberg.


                                    Plaintiffs,
                                    Judith and George Thibeau,
                                    by their attorney,

                                    James L. Frederick, Esq.
                                    BBO #543597
                                    Koufman & Frederick,LLP
                                    1330 Beacon Street, Suite 311
                                    Brookline, MA 02446-3202
                                    (617) 738-7880

# HERBERT W. EISENBERG, AIA

**123 North Washington Street**
**Boston, MA  02114**

December 6, 2005

James L. Frederick, Esq.
Frederick & Associates
1330 Beacon Street
Brookline, MA  02146-3202

Re:     Judith Thibeau

Dear Attorney Frederick,

       With regard to the above case and in response to your request I have reviewed the reports of defendant's experts and portions of Ms. Thibeau's deposition.  Based on this review I would supplement my original report as follows:

1.     Both handrails (on the wall side and the open side) for the inside stairs at the building located at 79 Paris Street could and should be extended so as to warn visually impaired persons that the stairway is ending and make the stairs reasonably safe for such persons.

2.     It is feasible that the handrail on the open (non-wall) side of the stairs at this building could be extended at the bottom of the stairs at the first floor landing; and it is my opinion that the lack of a handrail extension on this side of the stairs also constitutes a dangerous condition for visually impaired persons such as Ms. Thibeau.  Furthermore, it is my opinion that the handrail extension on the open side would not have to extend the width of one tread plus 12 inches, as it would have to extend on the wall side; but rather that an additional newel post could be added at the level of the first floor landing and the handrail extended four to six inches from the last riser into the landing area (which defendant's expert engineer Frederickson estimates to be 4 to 5 feet from the wall).  Furthermore, for the same reasons as I recommended an extension for the wall side handrail, the open side extension would also serve as a warning that the stairway is ending and that persons walking down the stairs should adjust their gait and balance when they know that they have actually reached the first floor landing at the bottom of the stairs

3.     My opinion still is that the lack of a handrail extension on the wall, as well as one on the inner side of the stairs, constitutes a dangerous condition for visually impaired persons such as Ms. Thibeau.

Sincerely

Herbert W. Eisenberg,, AIA, CSI/CDT
Life Safety Specialist

**tel 617.742.3154  fax 617.227.1086    herbeisenberg@alum.mit.edu**

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that a copy of the foregoing pleading was served upon the following attorney(s) VIA FIRST CLASS MAIL:

Christopher Alberto, Esq.
Assistant U.S. Attorney
United States Attorney for The District of Massachusetts
U.S. Courthouse, Suite 9200
1 Courthouse Way
Boston, MA 02210

Tory A. Weigand, Esq.
Morrison Mahoney, LLP
250 Summer Street
Boston, MA 02210

DATED: 12/1/, 2005

James L. Frederick, Esq.
BBO #543597
Koufman & Frederick, LLP
1330 Beacon Street, Suite 311
Brookline, MA 02446
(617) 738-7880

# EXHIBIT C

# NORTH SHORE CONTACT LENS & VISION CONSULTANTS, P.C.

ONE EXPRESSWAY PLAZA
SUITE 100
ROSLYN HEIGHTS, NY 11577

TEL: (516) 299-4540
FAX: (516) 299-4542
E-MAIL: NSCLA@AOL.COM

ARTHUR B. EPSTEIN, O.D., F.A.A.O.
JOSEPH M. FREEDMAN, O.D.

I have reviewed certain information with regard to the above case, which serves as the bases and reasons for the opinions and facts that I would testify to. I would also base my testimony on my education and experience in the field of optometry, my experience in treating optometric patients over a period of 28 years and the research that I have engaged in over the past 25 years, that has in part resulted in various publications that I have authored. My experience, education and publications are listed in my curriculum vitae.

The information that I reviewed includes:

1. Transcripts of the depositions of Judith and George Thibeau;

2. Transcript of the deposition of Dr. John Pietrantonio;

3. Vision Center protocol regarding dilation exams;

4. Judith Thibeau's treatment records from the eye clinic, including the records from 9/26/02;

5. Defendant United States' Answers to Interrogatories.

I have been paid approximately $1500 for my review and study of this case which has resulted in the opinions set forth in this report. Furthermore, if called to testify at trial, I will charge $1,500 as compensation for the time necessary for such testimony [assuming one half day of testimony.]

1. Dilating eye drops usually cause loss of contrast sensitivity, decreased depth perception, blurry vision, glare, sensitivity to light and disorientation.

2. Warnings regarding the effects of dilation should be given prior to the application of dilating drops.

3. If evidence confirms that warnings were not given as to the effects of dilation that would be a breach of the accepted standards of care.

4. On the date of the accident Ms. Thibeau was suffering from a unilateral dense cataract. The presence of this condition can reduce contrast sensitivity and interfere with depth perception. The dilation of her eyes on 9/26/02 likely caused additional loss of contrast sensitivity, decreased depth perception, blurry vision, glare, sensitivity to light and disorientation. In combination, the effects of the cataract and dilation caused Ms. Thibeau to suffer a greater increase in loss of contrast sensitivity, loss of depth perception and disorientation than would be expected from the standard effects of dilation.

# NORTH SHORE CONTACT LENS & VISION CONSULTANTS, P.C.

ONE EXPRESSWAY PLAZA
SUITE 100
ROSLYN HEIGHTS, NY 11577

TEL: (516) 299-4540
FAX: (516) 299-4542
E-MAIL: NSCLA@AOL.COM

ARTHUR B. EPSTEIN, O.D., F.A.A.O.
JOSEPH M. FREEDMAN, O.D.

5.     Considering Ms. Thibeau's existing diminished vision (due to her cataract) as she entered the eye clinic on 9/26/02, it would have been logical and prudent for the examining optometrist to consider the particular problems with Ms. Thibeau's vision and the combined effects of dilation and unilateral dense cataract in determining her need to be warned regarding the effects of dilation.

6.     The eye clinic and the examining optometrist probably should have considered that the stairs posed a risk to all patients, including Ms. Thibeau, who had been dilated; and either posted warning signs or given verbal warning to all patients, or notified them of the existence of an elevator and suggested that they use the elevator rather than take the stairs.

Arthur B. Epstein, OD., F.A.A.O.

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that a copy of the foregoing pleading was served upon the following attorney(s):

### BY HAND DELIVERY

Christopher Alberto, Esq.
Assistant U.S. Attorney
United States Attorney for the District of Massachusetts
U.S. Courthouse, Suite 9200
1 Courthouse Way
Boston, MA 02210

### BY FACSIMILE AND HAND DELIVERY

Tory A. Weigand, Esq.
Morrison Mahoney, LLP
250 Summer Street
Boston, MA 02210

DATED: 12/28/2005

James L. Frederick, Esq.
BBO #543597
Koufman & Frederick, LLP
1330 Beacon Street, Suite 311
Brookline, MA 02446
(617) 738-7880