UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MASSACHUSETTS

JUDITH THIBEAU                                                                  Docket No. 04-10643MLW
and GEORGE THIBEAU,
          Plaintiffs,

v.

UNITED STATES OF AMERICA
and EAST BOSTON NEIGHBORHOOD
HEALTH CENTER CORPORATION
          Defendants.

## PLAINTIFFS' PROPOSED FINDING OF FACT

1. On September 26, 2002 plaintiff Judith Thibeau fell at the bottom of the stairs located inside the building located at 79 Paris Street, East Boston.

2. Ms. Thibeau fell as a result of not seeing the last step at the bottom of the stairs.

3. As a result of such fall Ms. Thibeau suffered a serious fracture of her left ankle; complications during her recovery from such injury; permanent disfiguring and disabling injuries; and significant pain and suffering.

4. At the time of her accident Ms. Thibeau was leaving the eye clinic of the East Boston Neighborhood Health Center [hereinafter referred to as "the eye clinic"] after being examined in anticipation of cataract surgery on her left eye.

5. Prior to September 26 Ms. Thibeau had last been to the eye clinic on August 15, 2002 for examination due to symptoms she was suffering as a result of the development of a cataract in her left eye.

6. The symptoms Ms. Thibeau was suffering as a result of the cataract were problems with reading, blurry vision, halos around lights and problems with lights at night.

7. The symptoms Ms. Thibeau was suffering as a result of the cataract became worse from August 15, 2002 to September 26, 2002.

8. A person suffering from cataracts will experience additional side effects from eye dilation beyond those normally experienced by persons without cataracts.

9. On September 26, 2002 the combination of dilating drops and the cataract made Ms. Thibeau's vision in her left eye extremely impaired and limited.

10. On September 26, 2002 the additional impairment of vision in her left eye after dilation caused Ms. Thibeau to suffer greatly diminished depth perception.

11. Although Ms. Thibeau might have been able to see her feet, steps and the handrail at the time of her accident, her vision of her feet, the steps and the handrail would have been significantly impaired by the side effects of her eye dilation combined with the impact of her left eye cataract.

12. The eye clinic was located on the second floor of the building located at 79 Paris Street, East Boston.

13. Mr. and Ms. Thibeau had reached the clinic that day by walking up the stairs from the first to second floor of the building located at 79 Paris Street.

14. On September 26, 2002 there was an elevator located in the building at 79 Paris Street with openings on the first and second floor of that building.

15. Mr. and Ms. Thibeau had never used the elevator in the eye clinic building.

16. Mr. and Ms. Thibeau testified that, as of the time of Ms. Thibeau's accident they had never been aware of the presence of an elevator in the building located at 79 Paris Street.

17. As of September 26, 2002 it was not the policy of the eye clinic to notify patients that there was an elevator in the building.

18. As of September 26, 2002 there was no sign in the eye clinic that notified patients of the elevator.

19. As of September 26, 2002 there were no signs anywhere in the building at 79 Paris Street that notified patients that there was an elevator available for use by patients.

20. No agent or employee of the eye clinic ever notified the Thibeaus that there was an elevator available for their use.

21. At the beginning of her eye examination on September 26, 2002 an optometry student named Richard Price administered dilating eye drops to Ms. Thibeau's eyes.

22. Mr. Price administered such dilating drops in an examination room.

23. The only persons present in the examination room when Mr. Price administered the dilating drops were Mr. and Ms. Thibeau and Mr. Price.

24. At the time of her accident Ms. Thibeau's vision was affected by the dilating drops.

25. As of September 26, 2002 it was the policy of the eye clinic to give warnings about some but not all common side effects of eye dilation before dilating drops were administered.

26. As of September 26, 2002 it was the policy of the eye clinic to give patients the option to be dilated or not after warnings are given.

27. As of September 26, 2002 the eye clinic instructed all optometry students working at the clinic (such as Richard Price) that it was the policy of the eye clinic to give warnings about the side effects of eye dilation before dilating drops were administered and that it was the clinic's policy to give patients the option to be dilated or not dilated after such warnings were given.

28. The written protocol for the procedure to be followed when giving dilating eye drops at the eye clinic was as follows: "Dilation precautions are given and noted in the medical record.

Precautions included standard instruction of possible blurred vision, defer driving, sun sensitivity and care in returning home.  Mydriatic specs are offered."

29.	Mr. and Ms. Thibeau both testified that Mr. Price did not give any warnings regarding side effects of the dilating eye drops on September 26, 2002.

30.	Mr. Price testified had no memory of giving any warnings regarding side effects of dilating drops to Ms. Thibeau on September 26, 2002.

31.	Mr. Price had no knowledge of his examination and dilation of Ms. Thibeau other than what he had written in Ms. Thibeau's treatment record.

32.	Mr. Price said that the warning that he typically gave to patients whose eyes he dilated was that the drops "can make the vision blurry for a few hours and also make you more sensitive to light for a few hours."

33.	Mr. Price had no memory of offering Ms. Thibeau sunglasses or dark glasses after his examination of her on September 26, 2002.

34.	Mr. Price had no memory of telling Ms. Thibeau that she should be careful after having her eyes dilated.

35.	Mr. Price's description of his typical eye dilation warning that he said he was giving as of September 26, 2002 failed to follow the eye clinic's written protocol.

36.	Mr. Price's typical eye dilation warning that he said he was giving as of September 26, 2002 failed to follow the eye clinic's protocol by failing to give an instruction to defer driving and take care in returning home.  He also failed to follow such protocol by not offering mydriatic specs.

37.	The dilating eye drops administered to Ms. Thibeau on September 26, 2002 caused her vision to be impaired.

38. Dilating eye drops commonly cause the following side effects: loss of contrast sensitivity, decreased depth perception, blurry vision, glare, sensitivity to light and disorientation.

39. It is reasonable to infer that on September 26, 2002 as a result of eye dilation Ms. Thibeau was suffering from loss of contrast sensitivity, decreased depth perception, blurry vision, glare, sensitivity to light and disorientation.

40. At the time that dilating eye drops were administered to Ms. Thibeau on September 26, 2002 Ms. Thibeau already had impaired vision due to the presence of a cataract in her left eye.

41. On September 26, 2002 the combination of cataract symptoms and dilation side effects made Ms. Thibeau's vision in her left eye extremely limited and diminished.

42. On September 26, 2002 the extreme limitation and diminution in vision in Ms. Thibeau's left eye greatly diminished her normal depth perception.

43. On September 26, 2002 Dr. John Pietrantonio was the director of the eye clinic.

44. On September 26, 2002 the eye clinic acted through its employees, such as Dr. Pietrantonio, and his knowledge can be ascribed to the clinic.

45. On September 26, 2002 the eye clinic employed, oversaw and was responsible for the actions of students from the New England School of Optometry such as Richard Price.

46. On September 26, 2002 Richard Price was a student of the the New England School of Optometry working at the eye clinic.

47. On September 26, 2002 students such as Richard Price were trained by the clinic.

48. On September 26, 2002 students such as Richard Price were required by the clinic to administer eye drops according to the clinic's protocol.

49.     On September 26, 2002 Mr. Price was being supervised by Dr. Pietrantonio.

50.     As of September 26, 2002 Mr. Price had been trained by Dr. Pietrantonio.

51.     Prior to September 26, 2002 Judith Thibeau had her eyes dilated at the eye clinic on two occasions: August 15, 2002 and March 20, 1995.

52.     There is no written record that Ms. Thibeau was given warnings about the side effects of dilation on March 20, 1995.

53.     With regard to the dilation given on August 15, 2002 such dilation was performed by the eye student that examined Ms. Thibeau that day.

54.     With regard to the dilation given on August 15, 2002 Dr. Pietrantonio was not present for such dilation.

55.     With regard to the dilation given on August 15, 2002 Dr. Pietrantonio has no memory or first hand knowledge as to whether warnings were given regarding the side effects of dilation.

56.     Although Ms. Thibeau's treatment records from August 15, 2002 state that dilation warnings were given, there is no evidence as to what those warnings might have been.

57.     Ms. Thibeau testified that she was not given any warnings about the side effects of dilation on August 15, 2002.

58.     On September 26, 2002 Dr. Pietrantonio was not in the examination room when Mr. Price administered dilating drops to Ms. Thibeau.

59.     On September 26, 2002 the only persons who were in the examination room when Mr. Price administered dilating drops to Ms. Thibeau were Ms. Thibeau, Mr. Price and Mr. Thibeau.

60.     The only persons who have actual knowledge of whether any warnings were given to Ms. Thibeau regarding side effects of dilation were Ms. Thibeau, Mr. Thibeau and Mr. Price.

61. On September 26, 2002 the eye clinic knew or should have known that the common side effects of eye dilation were loss of contrast sensitivity, decreased depth perception, blurry vision, glare, sensitivity to light and disorientation.

62. On September 26, 2002 Dr. Pietrantonio knew or should have known that the common side effects of eye dilation were loss of contrast sensitivity, decreased depth perception, blurry vision, glare, sensitivity to light and disorientation.

63. On September 26, 2002 Mr. Price knew or should have known that the common side effects of eye dilation were loss of contrast sensitivity, decreased depth perception, blurry vision, glare, sensitivity to light and disorientation.

64. On September 26, 2002 Ms. Thibeau was not aware of all of the common side effects caused by dilation.

65. On September 26, 2002 Ms. Thibeau was only aware that dilation caused blurry vision and sensitivity to sunlight.

66. The common side effects of eye dilation of loss of contrast sensitivity, decreased depth perception, blurry vision, glare, sensitivity to light and disorientation caused stairs to be a dangerous condition for persons whose eyes were dilated.

67. The danger that stairs present for persons whose eyes are dilated included an increased risk of missing a step and falling.

68. As a result of the common side effects of dilation the stairs at 79 Paris Street became dangerous for patients whose eyes were dilated.

69. Considering that she was not aware of all of the common side effects of dilation on September 26, 2002 Ms. Thibeau was not aware of the extent of the danger or possible risks of harm that the stairs presented to her after her eyes were dilated.

70.     The eye clinic knew or should have known on September 26, 2002 the extent of danger or risk of harm posed by stairs to patients whose eyes were dilated.

71.     Ms. Thibeau fell because she missed the last step on the stairs leading from the second floor to the first floor.

72.     Ms. Thibeau's fall was caused by the side effects she was suffering as a result of having her eyes dilated.

73.     It is reasonable to infer that Ms. Thibeau fell because of loss of contrast sensitivity, decreased depth perception, blurry vision and disorientation.

74.     It is reasonable to infer that Ms. Thibeau's fall was caused by all of the side effects she was suffering as a result of having her eyes dilated.

75.     The stairs between the first and second floor of the building where the eye clinic was located were a dangerous condition to patients such as Ms. Thibeau whose eyes were dilated.

76.     On September 26, 2002 the eye clinic did not warn Ms. Thibeau to use care in descending the stairs.

77.     On September 26, 2002 the eye clinic did not warn Ms. Thibeau to use extra care while descending the stairs.

78.     For patients of the eye clinic whose eyes had been dilated the elevator was safer means of traveling from the second floor to the first floor.

79.     If Ms. Thibeau had used the elevator at 79 Paris Street she would have avoided falling at the bottom of the stairs.

80.     Given the known side effects of eye dilation it would be safer for a person to use the elevator at the eye clinic than taking the stairs.

81. Dr. Pietrantonio was not credible when he testified that he had given dilation warnings to Ms. Thibeau on August 15, 2002.

82. Dr. Pietrantonio was not credible when he testified that he met with Ms. Thibeau's in the examining room on September 26, 2002.

83. Dr. Pietrantonio was not credible when he testified that he spoke with Richard Price after the ambulance arrived to take Ms. Thibeau to the hospital.

84. Ms. Thibeau was credible when she testified that she had not been given any warnings regarding the side effects of dilation on August 15, 2002 or September 26, 2002.

85. Mr. Thibeau was credible when he testified that Richard Price did not give any warning to Ms. Thibeau regarding the side effects of dilation on September 26, 2002.

86. Mr. and Ms. Thibeau were credible when they testified that they had never noticed the elevator at 79 Paris Street at any time prior to Ms. Thibeau's accident.

87. Failing to give warnings about the side effects of eye dilation drops is a breach of the accepted standards of care for optometrists and optometric students such as Mr. Price.

88. The eye clinic failed to give Ms. Thibeau warnings regarding the side effects of dilation on August 15, 2002.

89. The eye clinic failed to give Ms. Thibeau warnings regarding the side effects of dilation on September 26, 2002.

90. Judith Thibeau did exercise due care for herself on September 26, 2002 and was not comparatively negligent.

91. As a result of the injuries suffered by Ms. Thibeau, her husband George Thibeau was caused to suffer the loss of companionship, services, and consortium of his wife.

**CONCLUSIONS**

92. By failing to give warnings prior to administration of dilating eye drops to Ms. Thibeau on September 26, 2002 Mr. Price, acting on behalf of the eye clinic, breached accepted standards of care for optometrists, violated the standards of care that had been adopted by the clinic and made part of their protocols and procedures and caused the eye clinic to breach its duty of care to Ms. Thibeau.

93. By failing to give warnings prior to administration of dilating eye drops to Ms. Thibeau on September 26, 2002 the eye clinic, breached accepted standards of care for optometrists, violated its own standards of care and breached its duty of care to Ms. Thibeau.

94. The eye clinic accepted as a duty of care to patients who it had treated and who had visual impairment due to eye dilation to make sure that such patients made it safely out of the building where the clinic was located at 79 Paris Street.

95. On September 26, 2002 the eye clinic breached its duty of care to Ms. Thibeau by failing to insure that Ms. Thibeau made it safely from the eye clinic to outside the building where the clinic was located.

96. On September 26, 2002 the eye clinic breached its duty of care to Ms. Thibeau by failing to advise Ms. Thibeau of the existence and availability of the elevator, by failing to warn Ms. Thibeau of all of the common side effects of dilation and by failing to warn Ms. Thibeau of the risk of harm posed by and the dangerousness of the stairs to persons whose eyes had been dilated (such as Ms. Thibeau).

97. On September 26, 2002 the eye clinic's breaches of its duty of care to Ms. Thibeau were the proximate cause of her falling at the bottom of the stairs in the building located at 79 Paris Street, East Boston.

98. Ms. Thibeau was caused to suffer serious and extensive injuries as a result of her fall at the bottom of the stairs in the building located at 79 Paris Street, East Boston.

99. The eye clinic breached its duty of care to Ms. Thibeau by:

   a. failing to exercise reasonable care to avoid or prevent foreseeable risks of harm to Ms. Thibeau;

   b. failing to warn Ms. Thibeau of the foreseeable risk of harm created by the common and expected side effects of eye dilation ;

   c. failing to warn Ms. Thibeau of the foreseeable risk of harm created by the common and expected side effects of eye dilation in combination with the use of stairs at the clinic after dilation;

   d. failing to warn Ms. Thibeau after having her eyes dilated that the stairs in the eye clinic building constituted a dangerous condition to her;

   e. failing to give Ms. Thibeau a sufficiently forceful, factually adequate warning of the side effects of eye dilation alone and in combination with the condition of the eye clinic's premises that Ms. Thibeau would encounter in exiting the clinic to leave the building where the clinic was located;

   f. failing to exercise reasonable care to avoid foreseeable physical harm to Ms. Thibeau by advising her of the existence and availability of the elevator which was an alternative and safer means of travel from the second to first floor of the clinic building.

100.    The eye clinic's failure to give adequate warnings to Ms. Thibeau creates the inference that if adequate warnings had been given, such warnings would have been followed and the accident prevented.

101.    The defendant has failed to rebut the foregoing inference.

102.    The eye clinic's breaches of its duty of care to Ms. Thibeau were proximate causes of Ms. Thibeau's accident and subsequent injuries.

> Plaintiffs,
> Judith and George Thibeau,
> by their attorney,
>
> /s/ James L. Frederick
> James L. Frederick, Esq.
> BBO #543597
> Koufman & Frederick, LLP
> 1330 Beacon Street, Suite 311
> Brookline, MA 02446-3202
> (617) 738-7880