UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
JUDITH THIBEAU                      )
and GEORGE THIBEAU,                 )
                                    )
    Plaintiffs,                     )   C.A. No. 1:04-cv-10643-MLW
                                    )
    v.                              )
                                    )
UNITED STATES OF AMERICA and EAST   )
BOSTON NEIGHBORHOOD HEALTH CENTER   )
CORPORATION,                        )
                                    )
    Defendants.                     )
_____ )

**UNITED STATES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The United States respectfully submits the evidence received by the Court at trial including witness testimony, Judith Thibeau's ("Mrs. Thibeau") medical records, and photographs of the East Boston Neighbor Health Center's ("Eye Clinic") stairwell support the following findings of facts and conclusions of law:

**PROPOSED FINDINGS OF FACT**

**I.  THE EYE CLINIC'S POLICY TO WARN PATIENTS COMBINED WITH MRS. THIBEAU'S MEDICAL RECORD DEMONSTRATE THE EYE CLINIC WARNED HER THAT THE EYE DILATION DROPS MAY COMPROMISE HER EYESIGHT.**

1.  The East Boston Neighborhood Health Center's ("Eye Clinic") policy is to warn all patients that have an eye dilation

1

       examination that their eyesight will be blurry and sensitive to light. (Gov. ex. 6; Gov. ex. 4.)

2. Moreover, the Eye Clinic provides an orientation for student doctors. (Gov. ex. 6, 7, 8, 9; Price tr. 8:23-9:2; Day 2 tr. 97:9-12.)

3. During that orientation, the Eye Clinic instructs student doctors to inform patients that eye dilation drops may make their eyesight blurry and eyes sensitive to light. (Gov. ex. 6; Day 2 tr. 99:11-13.)

4. The Eye Clinic also instructs student doctors to notate in a patient's medical chart each time that warning is provided to a patient. (Price tr. 10:5-10; Day 2 tr. 126:22-127:1.)

5. As the Thibeaus expert testified, the Eye Clinic's practice of notating the eye dilation warning in patient medical records is a step most eye clinics (80%) do not follow. (Epstein tr. 60:8-16.)

6. The dilation warning procedure is a main component of the orientation for student doctors. (Gov. ex. 6; Day 2 tr. 98:12-14.)

7. The Eye Clinic's protocol and procedures manual contains the dilation warning policy. (Day 2 tr. 88:1-2, 89:9-14; Gov. ex. 6.)

8. The dilation warning consists of cautioning the patient that his or her eyes will be blurry and sensitive to light. (Day 2 tr. 89:9-14.)

9. Dr. Richard Price's ("Dr. Price") standard practice was to provide an eye dilation warning to all patients that received eye dilation drops. (Price tr. 30:20-31:5; Gov. Ex. 3.)

10. Consistent with the Eye Clinic's policy to warn patients, Dr. Price's standard dilation practice included a warning that the patient's eyes may be blurry and sensitive to light. (Price tr. 30:20-31:5.)

11. On September 26, 2002, Dr. Price placed eye dilation drops in the eyes of other patients. (Gov. ex. 3.)

12. Just as he notated in Judith Thibeau's ("Mrs. Thibeau") medical record, Dr. Price notated "dilation warning given" in the medical records of the other patients that received eye dilation drops during his examinations. (Gov. ex. 3.)

13. On September 26, 2002, Dr. Price warned Mrs. Thibeau that the eye dilation drops may compromise her eyesight by making her vision blurry and her eyes sensitive to light. (Price tr. 14:10-11.)

14. On September 26, 2002, Dr. Price's dilation warning was notated in Mrs. Thibeau's medical record. (Gov. ex. 2; Day 2 tr. 109:22-24; Price tr. 14:10-11.)

15. Mrs. Thibeau does not remember anything that Dr. Price said during her eye examination on September 26, 2002. (Day 1 tr. 114:14-17.)

16. Dr. Price does not have a memory of what he said during the examination on September 26, 2002. (Price tr. 30:12-19.)

17. George Thibeau ("Mr. Thibeau") could not hear the complete conversation between Dr. Price and Mrs. Thibeau during the examination on September 26, 2002. (Day 2 tr. 21:14-15 ("[Dr. Price] may have responded. I didn't hear his answer. His back was toward me."); Day 2 tr. 62:23-63:4 ("Do you recall what [Dr. Price] said?" "No, I don't. [Dr. Price] was closer to [Mrs. Thibeau] and further from me and I just couldn't pick up exactly what he was saying to her.").)

**II. NOT ONLY DID THE EYE CLINIC WARN MRS. THIBEAU AND NOTATE THAT WARNING IN HER MEDICAL RECORD, BUT MR. AND MRS. THIBEAU ALSO HAD EXTENSIVE KNOWLEDGE REGARDING THE SIDE EFFECTS OF EYE DILATION DROPS ON SEPTEMBER 26, 2002.**

18. Mrs. Thibeau received medical care from the Eye Clinic twice in 1989. (Day 1 tr. 100:10-12; Gov. ex. 5.)

19. Mrs. Thibeau received medical care from the Eye Clinic twice in 1995. (Day 1 tr. 100:13-15; Gov. ex. 5.)

20. Mrs. Thibeau received medical care from the Eye Clinic in 1998. (Day 1 tr. 100:16-18; Gov. ex. 5.)

21. Mrs. Thibeau received medical care from the Eye Clinic in 2000. (Day 1 tr. 100:19-21; Gov. ex. 5.)

22. Mrs. Thibeau received medical care from the Eye Clinic on August 15, 2002. (Day 1 tr. 101:1-13; Gov. ex. 5.)

23. The last time Mrs. Thibeau received medical care from the Eye Clinic was on September 26, 2002. (Day 1 tr. 101:14-16; Gov. ex. 5.)

24. The Eye Clinic from which Mrs. Thibeau received medical care was always located at 79 Paris Street in East Boston. (Day 1 tr. 101: 17-18.)

25. The Eye Clinic was always located on the second floor at 79 Paris Street. (Day 1 tr. 101:20-22.)

26. Each time Mrs. Thibeau received medical care from the Eye Clinic she went up and down the same stairway. (Day 1 tr. 102:3-5.)

27. Each time Mrs. Thibeau entered and exited the Eye Clinic she passed by an elevator on the second floor. (Day 1 tr. 102:17-19.)

28. Each time she exited the Eye Clinic at 79 Paris Street she went by the elevator on the first floor (Id.)

29. Government's Exhibit 12 is a view of the stairs that Mrs. Thibeau used when she entered and exited the Eye Clinic. (Day 1 tr. 103:1-13; Gov. ex. 12.)

30. Government's Exhibit 11 is the view of the first floor landing that Mrs. Thibeau passed by each time she received medical care from the Eye Clinic. (Day 1 tr. 103:16-25; Gov. ex. 11.)

31. Mrs. Thibeau had her eyes dilated at the Eye Clinic on three different occasions. (The medical records show March 1995, August 15, 2002, and September 26, 2002). (Day 1 tr. 104:1-3; Gov. ex. 5.)

32. The first time she was scheduled for an eye dilation appointment, she drove herself to the Eye Clinic. (Day 1 tr. 104:4-6.)

33. When she arrived for her first eye dilation, the Eye Clinic refused to dilate Mrs. Thibeau's eyes. (Day 1 tr. 104:7-9; Gov ex. 5.)

34. The Eye Clinic personnel told Mrs. Thibeau that the eye dilation procedure would compromise her eyesight. (Day 1 tr. 104:16-19.)

35. The Eye Clinic personnel told Mrs. Thibeau that it would be unsafe for her to drive because her eyesight would be compromised by the eye dilation procedure. (Id.)

36. The Eye Clinic refused to dilate Mrs. Thibeau's eyes because she drove by herself. (Day 1 tr. 104:10-12.)

37. The Eye Clinic told Mrs. Thibeau that she must be accompanied by someone when she has her eyes dilated. (Id.)

38. The Eye Clinic personnel told Mrs. Thibeau that she must take care when she has her eyes dilated. (Id.)

39. Mrs. Thibeau's first scheduled appointment for the eye dilation procedure was in February of 1995. (Gov. ex. 5 p. 8.)

40. Mrs. Thibeau returned to the Eye Clinic on March 20, 1995 to have her eyes dilated. (Day 1 tr. 106:11-13; Gov. ex. 5 at 5.)

41. As the Eye Clinic instructed her, Mrs. Thibeau returned accompanied by someone for the March 20, 1995 eye dilation procedure. (Day 1 tr. 106:22-25.)

42. After the eye dilation procedure on March 20, 1995, Mrs. Thibeau's recognized her eyesight was blurry. (Day 1 tr. 107:4-5.)

43. After the eye dilation procedure on March 20, 1995, Mrs. Thibeau recognized her eyes were sensitive to sunlight. (Day 1 tr. 107:6-8.)

44. With her compromised eyesight, Mrs. Thibeau walked down the Eye Clinic stairwell. (Day 1 tr. 107:9-12.)

45. When going down the stairs, Mrs. Thibeau could see the steps. (Day 1 tr. 107:13-15.)

46. When going down the stairwell, Mrs. Thibeau could see the handrail. (Day 1 tr. 107:16-17.)

47. When going down the stairwell, Mrs. Thibeau could see her

        feet. (Day 1 tr. 107:18-19.)

48. Mrs. Thibeau had someone accompany her to the eye appointment on March 20, 1995 because the Eye Clinic told her it would be safer to have another person drive her home. (Day 1 tr. 108:1-3.)

49. The Eye Clinic told her it would be safer to have someone drive her home because her eye sight would be compromised. (Day 1 tr. 108:4-6.)

50. On September 26, 2002, Mrs. Thibeau knew the eye dilation procedure would make her eyesight blurry. (Day 1 tr. 108:7-11.)

51. On September 26, 2002, Mrs. Thibeau knew she had to take some care to watch where she was going after the eye dilation procedure. (Day 1 tr. 108:12-15.)

52. On September 26, 2002, when Mrs. Thibeau had her eyes dilated, she recognized she had blurry vision when she left the Eye Clinic. (Day 1 tr. 109:19-22.)

53. Just a month before Mrs. Thibeau fell on September 26, 2002, Mrs. Thibeau received medical care from Dr. John Pietrantonio at the Eye Clinic. (Day 1 tr. 114:18-25 - 115:1-15.)

54. At that appointment on August 15, 2002, Mrs. Thibeau had her eyes dilated. (Id.)

55. Dr. John Pietrantonio notated in Mrs. Thibeau's August 15, 2002 medical record "dilation warning given." (Gov. ex. 5)

56. Neither Dr. Pietrantonio nor Dr. Price falsely notated in Mrs. Thibeau's medical record "dilation warning given." (Gov. ex. 5)

57. Mrs. Thibeau's medical record is an accurate representation of what occurred during her many visits to the Eye Clinic. (Gov. ex. 5)

58. Mr. Thibeau accompanied Mrs. Thibeau to the September 26, 2002 appointment. (Day 2 tr. 60:5-7.)

59. Mr. Thibeau also had his eyes dilated at the Eye Clinic. (Day 2 tr. 64:3-8.)

60.  Mr. Thibeau had his eyes dilated at the Eye Clinic on two previous occasions.  (Day 2 tr. 64:3-8.)

61.  Mr. Thibeau was aware of the side effects eye dilation drops had when administered to his eyes.

### III.  MRS. THIBEAU'S UNFORTUNATE FALL ON THE EYE CLINIC'S STAIRWELL WAS NOT CAUSED BY ANY NEGLIGENCE ON THE PART OF THE EYE CLINIC'S DOCTORS.

62.  On September 26, 2002, Mrs. Thibeau had used the Eye Clinic's stairwell for over 13 years.  (Day 1 tr. 109:23-25; 110:1.)

63.  On two prior occasions, Mrs. Thibeau had been able to negotiate the Eye Clinic's stairs with blurry vision and with her eyes being sensitive to light.  (Day 1 tr. 110:2-8.)

64.  Mrs. Thibeau had her husband accompany her because it was safer to have him with her because her eyesight would be blurry.  (Day 1 tr. 110:15-25.)

65.  At the appointment Dr. Price dilated Mrs. Thibeau's eyes in order to examine her eyes. (Gov. ex. 2.)

66.  Mrs. Thibeau remained in the examination room for approximately 30-45 minutes. (Day 1 tr. 114:8-17.)

67.  Dr. Price notated in Mrs. Thibeau's medical chart that he provided her warning that the eye dilation procedure will compromise her eyesight. (Id.)

68.  No witness has a memory of the actual words Dr. Price used when he warned Mrs. Thibeau the eye dilation drops may make her eye sight blurry and sensitive to light.

69.  While no witness has a memory of the actual words used when Dr. Price provided Mrs. Thibeau a warning, Dr. Price testified that it was his practice to tell eye dilation patients that the dilation drops will make their eyesight blurry and sensitive to light.  (Day 1 tr. 114:5-7; Price tr. 30:12-19; Price tr. 30:20-31:5.)

70.  After the eye dilation procedure, Mr. and Mrs. Thibeau exited the Eye Clinic second floor office together. (Day 1

tr. 110:25 - 111:1-2; Day 2 tr. 22:18-20)

71. When Mr. and Mrs. Thibeau exited from the clinic's second floor doorway their view was that depicted in the photograph marked as Government Exhibit 12. (Gov. ex. 12.)

72. Both Mr. and Mrs. Thibeau walked past the elevator depicted in Government Exit 12.  (Gov. ex. 12.)

73. Mrs. Thibeau walked slowly down the stairs to the first floor of 79 Paris Street. (Day 1 tr. 111:1-2.)

74. Mr. Thibeau accompanied her down those stairs. (Day 1 tr. 111:5-6.)

75. While she slowly walked down the stairs Mrs. Thibeau held the stairwell's hand railing. (Day 1 tr. 111:3-4.)

76. While Mrs. Thibeau negotiated the Eye Clinic's stairwell, her husband left her in order to go to the restroom. (Day 1 tr. 111:7-11.)

77. After Mr. Thibeau left to go to the restroom, Mrs. Thibeau missed a step and fell.  (Day 1 tr. 111:10-25.)

78. The step that Mrs. Thibeau missed was the last step on the stairway.  (Day 1 tr. 112:3-5.)

79. Mrs. Thibeau fell just after she let go of the handrail. (Day 1 tr. 111:15-18.)

80. Mrs. Thibeau fell because she thought she was down at the bottom of the steps.  (Day 1 tr. 111:15-18.)

81. When Mrs. Thibeau fell, if she were looking at the steps she would have been able to see them.  (Day 1 tr. 112:6-113:11.)

82. When Mrs. Thibeau fell, if she were looking down at her feet, she could have seen them.  (Day 1 tr. 115:12-14.)

83. When Mrs. Thibeau fell, if she were looking at the handrail, she would have been able to see it.  (Day 1 tr. 113:15-17.)

**IV. MRS. THIBEAU'S CONCESSION THAT SHE DOES NOT REMEMBER ANYTHING DR. PRICE SAID ON SEPTEMBER 26, 2006, RENDERS HER**

8

       **INCOMPETENT TO TESTIFY ABOUT WHETHER OR NOT DR. PRICE WARNED HER THAT DILATION EYE DROPS COMPROMISE EYE SIGHT.**

84. Mrs. Thibeau does not remember anything that Dr. Price said during her 30-45 minute eye examination on September 26, 2002. (Day 1 tr. 114:14-17.)

85. Mrs. Thibeau's testimony that she does not remember anything that Dr. Price said during the 30-45 minutes examination on September 26, 2002 renders her incompetent to testify about whether or not Dr. Richard Price provided her an eye dilation warning. (Day 1 tr. 114:14-17.)

86. During testimony, Mrs. Thibeau recalled that in 1995 the Eye Clinic refused to dilate her eyes and told her that it would be safer to have somebody with her when she had her eyes dilated. (Day 1 tr. 105:17-25.)

87. Even though Mrs. Thibeau remembers what was said to her by Eye Clinic personnel in 1995, her testimony is incredible that she doesn't remember anything that Dr. Price said to her on September 26, 2002. (Day 1 tr. 114:14-17; Day 1 tr. 104:16-19.)

88. Finally, Mrs. Thibeau mistakenly testified that she never visited the Eye Clinic more than once a year except in 2000 because her memory failed her. (Day 1 tr. 96:3-9.)

**V. WHEN MR. AND MRS. THIBEAU EXITED THE EYE CLINIC THE SECOND FLOOR ELEVATOR WAS IN PLAIN SIGHT.**

89. When exiting the Eye Clinic, the elevator is in plain view. (Gov. Ex. 12; Day 1 tr. 103:10-13; Day 2 tr. 59:21-23; Day 3 tr. 50:25-51:3 ("The step is right next to the elevator, right next to the little piece of wall that has the buttons on it.").)

**VI. ON THE DAY OF THE ACCIDENT, THE EYE CLINIC STAIRS WERE SAFE.**

90. The Eye Clinic, including the stairs, are evaluated and examined by the safety committee at least twice per year. (Day 3 tr. 35:3-7.)

91. Nonskid strips were put on the Eye Clinic's stairs to prevent slips. (Day 3 tr. 37:12-13.)

92. On September 26, 2002, there was no defect in the stairs that would have created a dangerous situation. (Day 3 tr. 47:15-16.)

## PROPOSED CONCLUSIONS OF LAW

### VII. NO LIABILITY EXISTS FOR THE EYE CLINIC BECAUSE OF MRS. THIBEAU'S EXTENSIVE KNOWLEDGE REGARDING THE EFFECTS OF EYE DILATION DROPS.

93. Mrs. Thibeau's eyes were blurry before dilation. (Day 1 tr. 44:25.)

94. Mrs. Thibeau recognized that the cataract made her vision blurry. (Day 1 tr. 44:25.)

95. From past experience at the Eye Clinic, Mrs. Thibeau knew that eye dilation can cause blurry vision. (Day 1 tr. 40:12-17.)

96. On September 26, 2002, Dr. Price warned Mrs. Thibeau about the effects of dilation. (Gov. ex. 2; Day 2 tr. 109:22-24; Price tr. 14:10-11.)

97. On September 26, 2002, Mrs. Thibeau recognized that the dilating drops made her eyes blurry. (Day 1 tr. 55:1-5.)

98. When descending the stairs, Mrs. Thibeau could have seen the steps had she looked at the stairs. (Day 1 tr. 113:6-17.)

99. When descending the stairs, Mrs. Thibeau could have seen the handrail had she looked at the handrail. (Day 1 tr. 113:6-17.)

100. Mrs. Thibeau missed a step because she thought she was at the bottom of the stairs (Day 1 tr. 111:17-18) and not because her eyes were too blurry to see the step (Day 1 tr. 113:6-17).

101. Mrs. Thibeau knew at the time of her accident the effects of dilation (Day 1 tr. 40:12-17) and was aware of her impairments in her eyesight (Day 1 tr. 55:1-5).

102. Mrs. Thibeau knew at the time of her accident that she had to take care to watch where she was going. (Day 1 tr. 108:12-15.)

103. Mrs. Thibeau's extensive knowledge regarding the side effects from eye dilation drops absolved the Eye Clinic of liability. See Waters v. Banning, 162 N.E.2d 41, 42 (Mass. 1959) (Under Massachusetts law, "[the] duty to warn does not extend to dangers, knowledge of which the landowner may reasonably assume the visitor has."). Although Dr. Price warned Mrs. Thibeau about the side effects of eye dilation drops, her testimony demonstrates her extensive knowledge about those side effects. The Thibeaus ask this court to hold the Eye Clinic strictly liable if the Court finds Dr. Price did not tell her what she already knew on September 26, 2006. Liability ends once the defendant establishes the plaintiff had knowledge of the risks, otherwise the court would impose liability on a defendant for the plaintiff's failure to take due care. See Id.

104. No action within the accepted standard of care for dilation would have prevented the accident.

105. Thus, there is no liability for the accident attributable to the Eye Clinic.

**VIII.    NO LIABILITY EXISTS BECAUSE DR. PRICE GAVE MRS. THIBEAU AN EYE DILATION WARNING.**

106. Prior to dilation, Dr. Price warned Mrs. Thibeau that the dilating drops may cause blurry vision and sensitivity to light.

107. The warning was notated in Mrs. Thibeau's medical record.

108. Neither Dr. Price nor Mrs. Thibeau have a memory of what Price said during the examination on September 26, 2002. (Price tr. 30:12-19; Day 1 tr. 97:23-98:1; Day 1 tr. 98:22-99:2; Day 1 tr. 99:18-22.)

109. Mr. Thibeau could not hear the complete conversation between Dr. Price and Mrs. Thibeau during the examination on September 26, 2002. (Day 2 tr. 21:14-15 ("[Dr. Price] may have responded. I didn't hear his answer. His back was toward me."); Day 2 tr. 62:23-63:4.)

110. The First Circuit recognizes that medical records have an "indicia of reliability." See Manocchio v. Moran, 919 F.2d 770, 781 (1st Cir. 1990). In fact, Mrs. Thibeau's medical records are a more reliable source about what occurred in

       the Eye Clinic's examining room than testimony from Mrs. Thibeau and Dr. Price, who testified they have no memory of what was said, and Mr. Thibeau, who testified he could not hear everything that was said.

111.   Thus, based on the weight of medical records, the standard practice of the Eye Clinic, and the testimony of the witnesses, Dr. Price warned Mrs. Thibeau about the dangers of eye dilation.

**IX.**   **NO LIABILITY EXISTS BECAUSE THE EYE CLINIC GAVE MRS. THIBEAU A PROPER EYE DILATION WARNING.**

112.   Dr. Price's dilation warning, which included the fact that dilation can cause blurry vision and light sensitivity, was sufficient because it met the standard of care required by Massachusetts law. Palandjian v. Foster, 842 N.E.2d 916, 920 (Mass. 2006) ("[A] specialist should be held to the standard of care and skill of the average member of the profession [practicing] the specialty, taking into account the advances in the profession.").

113.   Dr. Price's warning met the standard of the average optometrist. (Day 2 tr. 141:13-21.)

114.   Moreover, the Eye Clinic exceeded the general standard of care by requiring its doctors to note in the medical records each time an eye dilation warning was given.

115.   Thus, under Massachusetts law, the dilation warning was adequate and the Eye Clinic is not liable.

**X.**   **NO LIABILITY EXISTS BECAUSE THE LOCATION OF THE ELEVATOR WAS OBVIOUS.**

116.   When exiting the Eye Clinic, the elevator is in plain sight. (Gov. ex. 12).

117.   Under the legal precedence of obvious dangers, there is no liability because the inherent danger of negotiating a flight of stairs and the close proximity of the elevator are obvious or should have been obvious to the Thibeaus as it would be to any other person of average intelligence that visits the Eye Clinic. See O'Sullivan v. Shaw, 726 N.E.2d 951, 954 (Mass. 2000) ("[I]t is well established in our law of negligence that a landowner's duty to protect

lawful visitors against dangerous conditions on his property ordinarily does not extend to dangers that would be obvious to persons of average intelligence.").

118. The Eye Clinic could "reasonably assume" that Mrs. Thibeau had knowledge of the elevator, which was in plain view, especially since she had been a patient of the Eye Clinic since 1989.  Waters, 162 N.E.2d at 42.

119. Failing to direct a plaintiff to an elevator in plain site is not negligence because the Eye Clinic could not anticipate that Mrs. Thibeau would not recognize the elevator.  Greenfield v. Freedman, 108 N.E.2d 242, 244 (Mass. 1952) ("Failure to warn the plaintiff [not to cut across the grass or to walk on the leaves when there is a safer path on the sidewalk was not negligence].  To impose liability upon the defendant in these circumstances would be to establish an unreasonable standard of perfection rather than to enforce the recognized standard of due care.").

                                        Respectfully submitted,

                                        MICHAEL J. SULLIVAN
                                        United States Attorney

                            By: */s/Christopher Alberto*
                                CHRISTOPHER ALBERTO
                                Assistant U.S. Attorney
                                U. S. Attorney's Office
                                1 Courthouse Way, Suite 9200
                                Boston, MA  02210
                                617-748-3100

<u>CERTIFICATE OF SERVICE</u>

    I, Christopher Alberto, Assistant U.S. Attorney, hereby certify that the foregoing was filed through the Electronic Court Filing system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

                                        */s/ Christopher Alberto*
                                        CHRISTOPHER ALBERTO
                                        Assistant U.S. Attorney