UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| JUDITH THIBEAU ) | |
| and GEORGE THIBEAU ) | |
| ) | Civil Action No. 04-10643-LTS |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA ) | |
| and EAST BOSTON NEIGHBORHOOD ) | |
| HEALTH CENTER CORPORATION ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

MEMORANDUM OF DECISION AFTER TRIAL
UNDER FEDERAL RULE CIVIL PROCEDURE 52

September 28, 2006

SOROKIN, M.J.

On September 26, 2002, Judith Thibeau was leaving the Vision Center ("eye clinic") of the East Boston Neighborhood Health Center ("EBNHC"), located on the second floor of 79 Paris Street in East Boston, Massachusetts. As she was descending the stairs to the first floor, she fell, shattering her ankle in numerous places and resulting in over $200,000.00 in medical bills. She brought suit against the EBNHC and the United States alleging negligence. Her husband, George Thibeau, brought a claim against the same defendants for his loss of consortium. The parties agree that the EBNHC is an "employee" of the United States. 28 U.S.C. § 1346(b)(1) provides that the United States District Court has exclusive jurisdiction over claims arising from the negligent acts or omissions of federal employees.

Beginning on June 28, 2006, the Court conducted a three-day bench trial. After trial, the parties submitted Proposed Findings of Fact and Conclusions of Law. Docket Nos. 59, 60, 62. Additionally, the United States moved to strike portions of the Plaintiffs' expert's trial testimony. Docket No. 57.

1

I make the following Findings of Fact and Conclusions of Law.

I.      Findings of Fact

This Court has jurisdiction over the Thibeau's claims pursuant to 28 U.S.C. § 1346(b)(1) and 28 U.S.C. § 1674 (the Federal Tort Claims Act, 'FTCA').  I find and adopt paragraphs one to six, inclusive, of the Findings of Fact and Rulings of Law jointly proposed by the parties in Docket No. 67.

The eye clinic is located on the second floor of 79 Paris Street, in East Boston, Massachusetts.   The associated health clinic is located in a separate building nearby.  A visitor to the eye clinic may access the second floor either by staircase or elevator.  The stairs are centrally located and plainly visible to a visitor upon entering the building.  The elevator is not plainly visible upon entering the building, but is plainly visible upon exiting the eye clinic on the second floor.  (Gov. Exh. 12; Pl.'s Ex. 1D, Day 1 tr.103 : 10-13; Day 2 tr. 59 : 22-23; Day 3 tr. 50 : 25-51 : 1-3).

Mr. and Mrs. Thibeau did not have actual knowledge of the existence of the elevator. (Day 1 tr. 103 : 21-25; Day 2 tr. 16 : 13-16).   As of September 26, 2002, the eye clinic did not notify patients that there was an elevator in the building.  (Day 2 tr. 143 : 18-21).  The building had no signs notifying patients that there was an elevator available for use by patients.  (Day 1 tr. 48 : 11-12; Day 2 tr. 143 : 25 – 144 : 1-2).  No agent or employee of the eye clinic ever notified the Thibeaus that there was an elevator available for their use.  (Day 1 tr. 48 : 9-10).

Mrs. Thibeau first received medical care from the eye clinic in 1989.  (Day 1 tr. 100 : 10-12; Gov. Exh. 5).  She next received medical care from the eye clinic on February 27 and March 20, 1995.  (Day 1 tr. 100 : 13-15; Gov. Exh. at 5). Mrs. Thibeau drove herself to the February 27, 1995, appointment, at which she was scheduled for an eye dilation.  The eye clinic informed her that they would not perform the dilation procedure because they were concerned that she

2

would not be able to drive herself home if she were to have her eyes dilated. (Day 1 tr. 104 : 1-19). Mrs. Thibeau left and returned to the clinic on March 20, 1995, this time driven to and from the clinic by someone else. (Day 1 tr. 106 : 1-13, 22-25).

Mrs. Thibeau's March 20, 1995, eye dilation caused her eyes to be blurry and sensitive to sunlight, and she understood this effect upon her vision. (Day 1 tr. 107 : 1-8). That day Mrs. Thibeau safely descended the stairs after the dilation procedure. (Day 1 tr. 107 : 9-12). The medical records of this visit contain no notation regarding eye dilation warnings. (Gov. Exh. 5 at 10). In 1996, Mrs. Thibeau returned to the eye clinic on one occasion. (Day 2 tr. 103 : 13-21; Gov. Exh. 5 at 12). She returned again in 1998, but deferred a dilation stating that she wanted to come back with Mr. Thibeau. (Day 2 tr. 104 : 16-21, 24-25 - 105 : 1-4; Gov. Exh. 5 at 13). She next returned in 2000. (Gov. Exh. 5 at 16-17).

On August 15, 2002, Mrs. Thibeau again visited the clinic. A student examined and dilated her eyes during this visit. (Day 2 tr. 107 : 20-25 - 108 : 1-11). During this exam, Mrs. Thibeau was diagnosed with cataracts. As a result, another examination was scheduled for September. Dr. Pietrantonio was (and is) the Director of the eye clinic. Dr. Pietrantonio made a notation in Mrs. Thibeau's August 15, 2002, medical record that a dilation warning was given. (Gov. Exh 5 at 20). Mrs. Thibeau denied receiving this warning. (Day 1 tr. 115 : 12-15). Dr. Pietrantonio testified that he had no actual memory of the August 15, 2002, examination or of whether the dilation warning was given beyond what was noted in the medical record. (Day 2 tr. 125 : 4-17). The clinic notes warnings in the chart as a matter of its own policies. This is a step most eye clinics (80%) do not take. (Price tr. 10 : 5-22; Day 2 tr. 126 : 22 – 25 - 127 : 1; Epstein tr. 60 : 8-16). Mrs. Thibeau left the eye clinic without incident.

Mrs. Thibeau's cataract caused blurry vision, halos around lights, and caused her problems with reading and with lights at night. (Day 1 tr. 43 : 11-13). Subsequent to her August 15, 2002, exam, Mrs. Thibeau's vision became blurrier. (Day 1 tr. 44 : 20-25 - 45 : 1-2).

Finally, Mrs. Thibeau returned to the eye clinic on September 26, 2002. She was

3

examined in anticipation of cataract surgery and had her eyes dilated, both by Dr. Richard Price
("Dr. Price"), then an optometry student.  (Day 2 tr. 108 : 22-25 - 110;  Gov. Exh. 5 at 21;  Day 1
tr. 114 : 5-7).  Mr. Thibeau accompanied his wife to this appointment and he remained
throughout the examination.  (Day 2 tr. 60 : 5-7).  Only the Thibeaus and Dr. Price were present
for the dilation. (Day 2 tr. 19 : 20-21).

On September 26, 2002, Dr. Price was a student interning at the New England School of
Optometry and working at the eye clinic.  (Day 2 tr. 96 : 3-14).  He had to administer eye drops
according to the eye clinic's protocol.  (Day 2 tr. 135 : 10-15).  The eye clinic's protocol and
procedures manual contains a dilation warning policy.[1]  (Day 2 tr. 88 : 1-2, 89 : 9-14).  The eye
clinic provides an orientation for student doctors.  (Gov. Exh. 6, 7, 8, 9; Price tr. 8 : 23-25 - 9 : 1-
2;  Day 2 tr. 97 : 9-12).  The dilation warning procedure is a main component of the orientation.
(Gov. Exh. 6; Day 2 tr. 98 : 12-14).  Dr. Pietrantonio conducted the training of Dr. Price.  (Price
tr. 8 : 21-22).

Dr. Price noted in the medical record that he gave Mrs. Thibeau a dilation warning.
(Gov. Exh. 2; Day 2 tr. 109 : 22-24; Price tr. 14 : 10-11).  Dr. Price does not have a memory of
what he said during the examination.  (Price tr. 19 : 13-21).  He testified that his standard
practice was to provide an eye dilation warning to all patients who received dilation drops.
(Price tr. 30 : 20-25 - 31 : 1-5; Gov. Exh. 3).  The warning Dr. Price ordinarily gave advised the
patient that the eye dilation drops may compromise her eyesight by making her vision blurry and
by making her eyes sensitive to light for a few hours.  (Price tr. 14 : 10-11, 30 : 20-25 - 31 : 1-5).
The eye clinic's procedures also directed that patients be told to defer driving, to take care in
returning home and of the availability of mydriatic specs.  (Day 2 tr. 89 : 9-14, 135 : 13-16).  Dr.
Price failed to tell Mrs. Thibeau of these additional points.  Mrs. Thibeau testified that Dr. Price

---

[1]The written protocol for the procedure to be followed when giving dilating eye drops at
the eye clinic was as follows: "Dilation precautions are given and noted in the medical record.
Precautions included standard instruction of possible blurred vision, defer driving, sun sensitivity
and care in returning home.  Mydriatic specs are offered."  (Gov. Exh. 6).

4

did not give her any warning at all about the dilation.   (Day 1 tr. at 39 : 16-21).   I find that the eye clinic gave Mrs. Thibeau a general warning of hazards posed by the dilation procedure both on September 26, 2002, and at her prior visit on August 15, 2002.[2]

At the conclusion of the entire examination,[3] the Thibeaus left the clinic.  Together they walked out the door of the clinic and proceeded to take the stairs to the first floor.  Mrs. Thibeau walked "slowly" down the stairs to the first floor, holding onto the stairwell's left handrail.  (Day 1 tr. 110 : 25 - 111 : 1-4).  Mr. Thibeau accompanied Mrs. Thibeau down the stairs, walking on her right side, but not in physical contact with her.  (Day 1 tr. 111 : 5-6, 21-23).  When he was four or five steps from the bottom of the stairs, Mr. Thibeau left Mrs. Thibeau's side to use the restroom.  (Day 1 tr. 111 : 7-11).   Thereafter, Mrs. Thibeau missed a step and  fell.  (Day 1 tr. 111 : 12-25).  At that time, she was looking "straight ahead."  (Day 2 tr. 6:20-22)  The step that Mrs. Thibeau missed was the last step on the stairway.  (Day 1 tr. 54:13-20, 112 : 3-5).  Mrs. Thibeau fell just after she let go of the handrail.  (Day 1 tr. 111 : 15-18).  She thought she had reached the bottom of the steps.  (Day 1 tr. 111 : 15-18).  Mrs. Thibeau could see her feet, steps and the handrail at the time of her accident, however, her vision was affected by the dilation. (Day 1 tr. 109 : 19-22, 113 : 4-17).  Her vision was "blurry."  (Day 2 tr. 6:23-24)

There was no inherent problem with the stairs.  (Day 3 tr. 47 : 15-16).   The eye clinic, including the stairs, are evaluated and examined by the EBNHC's safety committee at least twice per year.  (Day 3 tr. 35 : 3-7).   The stairs had nonskid strips to prevent slips.  (Day 3 tr. 37 : 12-14).

When Mrs. Thibeau left the clinic on September 26, 2002, she was aware of the problems with her vision.  She knew that she suffered from a cataract which was causing her various vision

---

[2]  I find Mrs. Thibeau credible when she stated she did not believe a warning had been given at either exam.  I simply do not believe she is correct.

[3]  During the examination, but after the dilation, an eye surgeon discussed the cataract surgery with the Thibeaus.

5

problems. (Day 1 tr. 42 : 11-13, 43 : 11-13). Mrs. Thibeau was also aware that the dilation procedure meant that she could not drive herself home and that her eyes would be "sensitive to light." (Day 1 tr. 40 : 15-17). She had a specific awareness that the dilation procedure would make her eyesight "blurry," (Day 1 tr. 108 : 7-11), and that, as she went to descend the stairs, her vision was in fact "blurry." (Day 1 tr. 55 : 5, 109 : 19-22). She knew she needed to use "care" in watching where she went after the dilation. (Day 1 tr. 108:12-16) Indeed, she held onto the handrail "because, you know, my eyes were blurry." (Day 1 tr. 58 : 9).

II.    Conclusions of Law

The FTCA provides that, with some exceptions not relevant to this case, the United States is liable for torts "to the same extent as a private individual under like circumstances." 28 U.S.C. § 1674. As a result, the standard of liability applicable to a suit for negligence pursuant to the FTCA is provided by the law of the state in which the tort is alleged to have occurred. See, Molzof v. United States, 502 U.S. 301, 305 (1992) and cases cited therein.

Because the torts alleged in this case occurred in Massachusetts, that state's law applies. To prevail on a negligence claim under Massachusetts law, a plaintiff must show by a preponderance of the evidence that the defendant committed a breach of the duty to use reasonable care, that the plaintiff suffered actual loss, and that the defendant's breach caused that loss. Causation is an essential element of that proof. Glidden v. Maglio, 430 Mass. 694, 696 (2004). To prevail on her negligence claim, then, Mrs. Thibeau must show that EBNHC breached its duty to give reasonable warnings to her of the effects of the dilation procedure, that she suffered actual injury, and that EBNHC's failure to give reasonable warning was the cause of her injury.

It is undisputed that Mrs. Thibeau suffered significant injuries in her fall. Her negligence claim must fail, however, because she has not shown by a preponderance of the evidence that the

EBNHC breached its duty to warn her in a reasonable fashion about the effects of the dilation procedure, and because even if it had breached that duty, Mrs. Thibeau cannot show by a preponderance of the evidence that such a breach was the proximate cause of her damages.

Mrs. Thibeau first argues that the clinic breached its duty of care because it failed to give any dilation warning. I reject this argument. As noted above, I found that the clinic did warn Mrs. Thibeau. Moreover, even if the clinic had not given the general warning (and I found that they did), it would not be liable for negligence because Mrs. Thibeau was already aware of the general effects to her vision of the dilation procedure.

In negligence cases premised upon a defendant's "failure to warn," it is the reasonableness of the defendant's actions in all of the circumstances that is at issue. Hoffman v. Houghton Chemical Corp., 434 Mass. 624, 637 (2001). There is no liability for failing to warn someone of a risk or hazard which she already appreciates to the same extent as a warning would have provided. Slate v. Bethlehem Steel Corp., 400 Mass. 378, 381 (1987) (quoting W. Prosser & W. Keeton, Torts § 96 at 686 (5th ed. 1984)). Mrs. Thibeau was already well aware of the general effects upon her vision of the dilation procedure. She knew as she descended the staircase that her eyesight was blurry, and she held onto the handrail for that reason. Therefore, I find that even if the eye clinic had failed to give a warning, it would not be liable because its failure would not have been the proximate cause of Mrs. Thibeau's injuries.

The warning Dr. Price gave did not comply with the clinic's policy in three respects. He failed to advise Mrs. Thibeau both not to drive and to use caution in leaving the clinic. Neither failing proximately caused her injuries. She did not drive, she knew to use care in leaving the clinic and she did use care in leaving the clinic. Also, Dr. Price failed to offer Mrs. Thibeau mydriatic specs (UV blocking sunglasses). I find that the standard of care did not so require. Plaintiff's expert both in his report, Pl.'s Ex. 2, and on direct examination in explaining the

warning that Mrs. Thibeau should have received, Epstein tr. 36-37 & 48-49, omitted any mention of providing such specs.  In any event, Dr. Price did warn Mrs. Thibeau that the dilation would cause her eyes to be sensitive to light.  I do not find that the failure to provide such specs proximately caused her injuries while descending a stairwell lacking windows.

Second, the Thibeaus argue that a general warning was insufficient and that the eye clinic had a duty to give Mrs. Thibeau an individualized and more specific warning.  In support of this theory, they called an optometrist as an expert.  The expert, Dr. Arthur Epstein, testified that:

Dilating drops commonly cause loss of contrast sensitivity, decreased depth perception, blurry vision, glare, sensitivity to light and disorientation, (Epstein tr. 15 : 3-25 - 21 : 1-13, 22 : 17-24);

A person suffering from cataracts will experience additional side effects from eye dilation beyond those normally experienced by persons without cataracts,  (Epstein tr. 23: 15-25 - 24 : 2-3);

The combination of cataract symptoms and dilation side effects made Mrs. Thibeau's vision in her left eye extremely limited and diminished, (supported implicitly by Epstein tr. 32 : 5-25 - 34 : 2-8);

The extreme limitation and diminution in vision in Mrs. Thibeau's left eye greatly diminished her normal depth perception, (Epstein tr. 32 : 5-25 - 34 : 2-8)

The stairs between the first and second floor of the building where the eye clinic was located were a dangerous condition to patients such as Mrs. Thibeau whose eyes were dilated, (Epstein tr. 33 : 25 - 34 : 2-8);

The danger that stairs present for persons whose eyes are dilated included an increased risk of missing a step and falling, (Epstein tr. 33 : 25 - 34 : 2-8);

For patients of the eye clinic whose eyes had been dilated the elevator was safer means of traveling from the second floor to the first floor, (Epstein tr. at 36 : 24-25 - 37 : 2);

If Mrs. Thibeau had used the elevator at 79 Paris Street she would have avoided falling at the bottom of the stairs, (Epstein tr. at 39 : 16 - 18);

8

Failing to give warnings about the side effects of eye dilation drops is a breach of the accepted standards of care for optometrists,  (Day 2 tr. 90 : 13-16; Epstein tr. 32 : 19-25, 33 : 1-10); and

The standard of care required a particularized tailored warning to Mrs. Thibeau identifying all of the possible effects of the dilation on her, given her cataracts, and specifically cautioning her regarding the stairs,  (Epstein tr. 28 : 8-25 - 29 : 1-5).

I reject the key parts of Dr. Epstein's opinion: that the accepted standard of care required the eye clinic to warn Mrs. Thibeau as to each of the side effects of dilation that he discussed; that the accepted standard of care required the eye clinic to deliver a heightened or tailored warning; or, that the standard of care required the clinic to direct dilated patients to the elevator. First, Dr. Epstein pointed to no document or organization, or even another practitioner, endorsing his version of the standard of care.  He acknowledged that two professional organizations have developed standards of care (Epstein tr. 27 : 8-14), but he pointedly avoided stating that either organization adopted the standard he pronounced.  (Epstein tr. 27 : 1-24, 47 : 8-21, 53 : 14-25 - 55 : 2-35 : 12-25 - 37 : 2-16).  Rather, he discussed evolving standards of care, id., at 53 : 14-25 - 55 : 2, without ever identifying the specific basis for believing the standard of care, as of September 26, 2002, required the warning he proposed.  Second, a warning provides notice.  The clinic's warning placed Mrs. Thibeau on notice both that her vision was blurry and that she would be sensitive to light.  I am unpersuaded that the further detail regarding various compromised aspects of her vision necessarily would improve the effectiveness of the warning. Indeed, Dr.  Epstein acknowledged that the effectiveness of a warning depends as much on the delivery as the content. Epstein tr. 26 : 5-10. In this case Mrs. Thibeau understood the essence of any warning – that her vision was impaired thereby requiring caution – and acted accordingly – she proceeded down the stairs "slowly" holding the handrail.  Third, Dr.  Epstein conceded that the stairs were a permissible means of egress for a person in Mrs. Thibeau's condition. When asked on direct examination to explain the appropriate warning for Mrs. Thibeau, he stated, inter

alia, that the eye clinic should have included either a suggestion to use the elevator or a caution to use care on the stairs.  Epstein tr. 36 : 22-25 - 37 : 2-3.  Mrs. Thibeau was aware the dilation affected her vision and, I find, was aware of the need to use care in descending the stairs.  In any event, the elevators were in plain view upon exiting the clinic's second floor office.  I find Dr. Epstein's testimony unpersuasive.

Both Mr. and Mrs. Thibeau were credible and sympathetic witnesses.  The evidence is undisputed that Mrs. Thibeau suffered a terrible break to her ankle and endured a long and difficult recovery period despite her best efforts leaving her with permanent physical scars and impairment.  The undisputed medical records establish she incurred more than $200,000.00 in medical expenses arising from her broken ankle.  Mrs. Thibeau has the Court's sympathy for the suffering she endures.  Nonetheless, for all the foregoing reasons, Mrs. Thibeau has not established all the elements of her claim.

Mr. Thibeau's loss of consortium claim is derivative of Mrs. Thibeau's negligence claim. Accordingly, his claim fails as well.

In light of the Court's decision on the merits of the Plaintiffs' claims, I DENY the Motion as MOOT the United States' motion to strike portions of the testimony of Plaintiff's expert.

The Clerk shall return the exhibits to counsel for the parties, Local Rule 79.1.  Counsel for the defendants shall submit a proposed form of judgment by October 6, 2006.


　　　　　　　　　　　　　　/s / Leo T. Sorokin
　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE